# RECORD IMPOUNDED

## NOT FOR PUBLICATION WITHOUT THE
## APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4820-18T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

T.W.K.T.,

     Defendant-Appellant,

and

D.B.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF I.M.B.
and A.B.,

     Minors.

_____

Submitted April 20, 2020 – Decided May 13, 2020

Before Judges Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0054-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Laura M. Kalik, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Joann M. Corsetto, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; James Dey Harris, Designated Counsel, on the brief).

PER CURIAM

Defendant T.W.K.T. (T.T.),[1] the biological mother of I.M.B. (Ian) and A.C.B. (Audrey), appeals from the June 19, 2019 judgment of guardianship terminating her parental rights to the children.[2] T.T. contends that the Division of Child Protection and Permanency (Division) failed to prove the third and fourth prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. For

---

[1] We refer to the parties by initials and the resource parents and children by initials and pseudonyms to preserve their confidentiality and for ease of reference. R. 1:38-3(d)(12).

[2] Defendant D.B. is Ian and Audrey's biological father. He has not appealed the termination of his parental rights or participated in this appeal.

the following reasons, we disagree and affirm the termination of T.T.'s parental right to Ian and Audrey.

## I.

We will not recite in detail the history of the Division's interactions with Ian and Audrey and their parents. Instead, we incorporate by reference the factual findings and legal conclusions contained in Judge Wayne J. Forrest's comprehensive June 19, 2019 written opinion. We summarize only the salient facts pertinent to our discussion.

T.T. has five biological children, none of whom are in her care or custody. Ian was born on December 29, 2015. He was placed in the care and custody of the Division two days after his birth. In January 2016, T.T. participated in several supervised visits with Ian. During one visit, T.T. suggested that Ian be placed with J.H. (Janet), who was already caring for T.T.'s stepsister.[3] For the remainder of 2016, T.T. "had inconsistent visitation with [Ian]" and D.B. "barely visited [Ian] at all."

T.T.'s inconsistent visitation continued in 2017; D.B. had no visits with Ian that entire year. Audrey was born on December 25, 2017. She has spent

---

[3] Janet is the paternal aunt of M.T., T.T.'s eighteen-year-old stepsister.

A-4820-18T4

almost her entire life living in the home of her resource parent, S.M. (Sophia). During 2018, D.B. did not visit Ian or Audrey; T.T. visited sporadically. That pattern continued in 2019 until the guardianship trial. In total, Ian has spent all but his first few months living in the home of his resource parent Janet, who desires to adopt him. Likewise, Sophia desires to adopt Audrey.[4]

On May 23, 2018, the Division filed a guardianship complaint to terminate the parental rights of T.T. and D.B. as to both Ian and Audrey. The trial court conducted a three-day trial. The Division produced three witnesses: Justin Leonard, a Division caseworker; Stephanie Holliday, a Division adoption worker; and David R. Brandwein, Psy.D., a licensed psychologist. D.B. did not appear for trial. T.T. did not attend trial except for appearing telephonically for the Division's closing argument. Neither defendant produced any witnesses nor introduced any evidence.

Judge Forrest found Leonard and Holliday to be credible witnesses "based on their firsthand knowledge of the facts of this case, their ability to thoroughly recount key points of their investigation and testify consistent with the evidence, and their professional demeanor and manner in which they testified on both direct and cross[-]examinations." The judge likewise found Dr. Brandwein, who

---

[4] Sofia previously adopted T.T.'s other son, L.T.

4

was stipulated as an expert in psychology, to be a credible expert witness "based on his thorough understanding of the facts of the case, candid responses to questions posed to him, and his education, training and extensive experience as a licensed psychologist." Dr. Brandwein was the only expert to testify during trial.

In his comprehensive written opinion, Judge Forrest reviewed the evidence presented at trial and concluded that: (1) the Division had proven all four prongs of the statutory best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of T.T. and D.B.'s parental rights was in Ian and Audrey's best interests. This appeal followed.

T.T. raises the following points for our consideration:

> I. THE TRIAL COURT ERRED IN TERMINATING [T.T.'S] PARENTAL RIGHTS BECAUSE THE STATE FAILED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN UNDER N.J.S.A. 30:4C-15 AND N.J.S.A. 30:4C-15.1.
>
>> A. THE COURT ERRED IN HOLDING THAT DCPP PROVED THAT IT HAD MADE REASONABLE EFFORTS TO PROVIDE SERVICES TO [T.T.], PURSUANT TO PART ONE OF PRONG THREE, BECAUSE DCPP'S OWN EXPERT POSITED THAT [T.T.] HAD NOT BEEN PROVIDED APPROPRIATE MENTAL HEALTH TREATMENT.

A-4820-18T4

B. THE COURT FAILED TO SUFFICIENTLY ADDRESS ALTERNATIVES TO TERMINATION, PURSUANT TO PART TWO OF PRONG THREE AND PRONG FOUR, SPECIFICALLY BY NOT EXPLORING [KINSHIP LEGAL GUARDIANSHIP] OR PLACEMENT WITH OTHER RELATIVES.

1. The court did not properly analyze alternatives to termination or whether termination would not do more harm than good because [kinship legal guardianship] was never adequately explored.

2. DCPP failed to reasonably explore placement with other relatives.

## II.

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999) (citations omitted). That right is not absolute, however. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing K.H.O., 161 N.J. at 346). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009) (citing N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). To effectuate these concerns, the Legislature created a statutory

6

test to determine when it is in the child's best interest to terminate parental rights, which requires the Division to prove all four prongs by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four standards later codified in Title 30).]

The four prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J.

261, 280 (2007) (emphasis omitted) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "[B]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare, 154 N.J. at 413). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006). "Concomitantly, reviewing courts should defer to the trial court's credibility determinations" as well. R.G., 217 N.J. at 552.

It is "[o]nly when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark'" that we will intervene and make our own findings "to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)). However, the court's interpretation of the law or its legal conclusions are reviewed de novo. State ex rel. A.B., 219 N.J. 542, 554-55 (2014) (citations omitted).

8

## III.

We now turn to T.T.'s argument that the trial court erred in finding the Division proved the third and fourth prongs under the best interests test by clear and convincing evidence. Accordingly, we limit our discussion to those issues. Based on our careful review of the record and applicable legal principles, we are satisfied that the evidence in favor of the guardianship petition amply supports the decision to terminate T.T.'s parental rights. We affirm substantially for the reasons set forth by Judge Forrest in his well-reasoned, seventy-page June 19, 2019 opinion. We add the following comments.

## A.

Prong three requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home," and the court to "consider[] alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

"Reasonable efforts" is defined as "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." N.J.S.A. 30:4C-15.1(c). Those efforts are "not measured by their success." In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999).

9

T.T. primarily argues the Division failed to establish it made reasonable efforts to provide services because she was not provided appropriate mental health treatment, particularly trauma-focused therapy. We disagree. The record shows the Division made reasonable efforts to reunite T.T. with her children.

The trial court recounted the numerous services the Division provided to T.T. to address her mental health issues, including individual counseling, parenting classes, therapeutic visitation, psychological evaluations, and substance abuse evaluations and treatment. The Division also provided transportation assistance to T.T. and D.B. to attend visitation sessions but suspended the bus passes after T.T. and D.B. ignored warnings and continued to not visit with Ian. Moreover, the Division later engaged PEI Kids to transport Ian in the hope that the shorter distance would encourage visitation.

T.T. was largely non-compliant with those services and visitation. Her visits were sporadic. She failed to regularly attend individual counseling and other services. By the end of 2016, T.T. had missed ten referrals to Preferred Children's Services for a substance abuse evaluation. When T.T. finally entered intensive outpatient substance abuse treatment, she was discharged for non-compliance. When speaking to a Division caseworker in March 2017, T.T.

A-4820-18T4

complained that the process was "taking too long," and she did not wish to pursue further services through the Division.

T.T. and D.B. did not make themselves available to their caseworker or participate in court-ordered services during the majority of 2017. While T.T. completed parenting classes at Mercer Street Friends, she did not comply with any of the services it recommended upon discharge. "On February 26, 2018, Oaks Integrated terminated [T.T.] from its program because she had not scheduled or attended a therapy session in over ninety days." Between August 2018 and February 2019, T.T. was discharged from a parenting skills program, individual counseling, and therapeutic visitation by Children's Home Society due to lack of attendance.

Dr. Brandwein diagnosed T.T. with borderline personality disorder and noted her history of substance abuse. He opined that T.T. "began showing signs of Borderline Personality Disorder as a teenager including her suicide attempts and psychiatric hospitalizations," and her "adult life has been characterized by problems [in relationships] with her family and romantic partners, extreme levels of rage, [and] a tendency towards impulsive behavior and impulsive displays of emotion." He noted that Division records indicate T.T.'s lack of insight "into the impact of mental health difficulties on her ability to care for

11

herself and her children" and her "dismal record" of attending services. Although recognizing that psychotherapeutic and psychopharmacological interventions "can blunt the impact of symptoms," Dr. Brandwein concluded that T.T. was not "a candidate to participate, complete, and/or benefit from treatment modalities, and further referrals to these modalities would not result in different outcomes."

T.T. also argues the Division failed to correct the circumstances that led to her children's placements. Yet she refused to end her ongoing relationship with D.B. that subjected her to frequent acts of physical violence—even while pregnant—and repeatedly did not seek a final restraining order under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. Even after T.T. eventually reported that she severed ties with D.B., in late January 2018, she could not promise that they would not reunite. T.T. also refused to take her prescribed medication for bipolar disorder and disagreed with this diagnosis. Thus, T.T.'s own conduct utterly thwarted reunification efforts.

We are satisfied that the record fully supports the trial court's finding that the Division made "reasonable efforts" to provide appropriate services to both parents. The Division engaged in such efforts for over three years—assisting T.T. with her substance abuse, providing counseling, and arranging visitation—

12

to reunite her with Ian and Audrey. As the court noted, T.T. and D.B. participated in many of those services, albeit inconsistently and almost entirely without success.

The Division must also establish "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). T.T. argues the Division failed to sufficiently address alternatives to termination of parental rights by: (1) failing to explore placement with other relatives; and (2) not exploring kinship legal guardianship (KLG). We disagree.

The Division must "initiate a search for relatives who may be willing and able to provide the care and support required by the child, N.J.S.A. 30:4C-12.1(a), and the Division's policy is to place, whenever possible, children with relatives." N.J. Div. of Youth and Family Servs. v. M.F., 357 N.J. Super. 515, 529 (App. Div. 2003) (citing N.J. Div. of Youth and Family Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002)). However, there is no common law or statutory "presumption in favor of such placement." Id. at 528-29.

T.T. argues that the Division's decision to rule out S.B., D.B.'s mother, as a caregiver was arbitrary and unreasonable. We are unpersuaded by this argument. Indeed, T.T. herself did not want Ian and Audrey placed in S.B.'s home. She voiced concern over the small size of S.B.'s residence and her lack

13

of mobility. T.T. also feared S.B. would refuse to let her visit the children. The record shows the Division interviewed and considered four relatives for possible placement and appropriately ruled out relative placement.

T.T. also argues the Division never adequately explored KLG. KLG is a potential alternative to termination of parental rights. N.J. Div. of Child Prot. and Permanency v. M.M., 459 N.J. Super. 246, 259 (App. Div. 2019). Its purpose "is to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them and when adoption is neither feasible nor likely." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (2007) (citations omitted). In that regard, the Legislature declared, "[i]n considering kinship legal guardianship, the State is seeking to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships where adoption is neither feasible nor likely." N.J.S.A. 3B:12A-1(c).

As we explained in M.M., "candidates for KLG must be adequately informed of the nature of such arrangements and the financial and other services for which they may be eligible." M.M., 459 N.J. Super. at 261. To achieve that objective, the Legislature enacted the Kinship Legal Guardianship Notification

Act (Notification Act), N.J.S.A. 30:4C-89 to -92, "to ensure that individuals who may be eligible to become kinship legal guardians are aware of the eligibility requirements for, and the responsibilities of, kinship legal guardianship and . . . [also] the services available to kinship legal guardians in the State." Ibid. (quoting N.J.S.A. 30:4C-90(e)). To meet this notification mandate, the Notification Act requires the Division to inform individuals who may be eligible for KLG of the information set forth in N.J.S.A. 30:4C-91. Ibid.

The record demonstrates that KLG was explored through discussions with Janet and Sophia. On July 16, 2018, a caseworker visited Janet and spoke to her about KLG versus adoption for Ian. Janet indicated that she was only interested in adoption. On August 20, 2018, a caseworker spoke to Sofia about KLG versus adoption for Audrey. Sofia likewise indicated that she was only interested in adoption. On May 3, 2019, Janet and Sofia each reaffirmed they were committed to adopting Ian and Audrey, respectively.

In M.M., we recognized that KLG was "appropriate only if 'adoption of the child is neither feasible nor likely.'" Id. at 262 (quoting N.J.S.A. 3B:12A-6(d)(3)(b)); accord S.F., 392 N.J. Super. at 209. Here, adoption of the children was feasible and likely. The Division's court-approved plan is for Ian and Audrey's respective resource parents to adopt them, which the Law Guardian

supports. "[W]hen the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights under N.J.S.A. 30:4C-15.1(a)(3)." N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 513 (2004); see also N.J. Div. of Youth & Family Servs. v. T.I., 423 N.J. Super. 127, 130 (App. Div. 2011) (when a resource parent in a guardianship action "unequivocally asserts a desire to adopt, the finding required for a KLG that 'adoption of the child is neither feasible nor likely' cannot be met"). The judge properly determined that KLG was not a viable option.

B.

Under the fourth prong, the Division must demonstrate that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15(a)(4). This prong does not "require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O, 161 N.J. at 355. The judge must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012) (citing

K.H.O, 161 N.J. at 355). "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that [her] most deeply formed attachments will not be shattered." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012).

The court noted Ian "was very happy and smiled frequently" during Janet and Ian's bonding evaluation. Additionally, Janet engaged Ian and played with him throughout the evaluation. Ian also referred to Janet as "mommy" and Dr. Brandwein opined that she is Ian's psychological parent. Accordingly, Dr. Brandwein found that Ian "would suffer serious and enduring psychological harm if his relationship with [Janet] was terminated."

Regarding Audrey, Dr. Brandwein testified that although she "is too young to be securely bonded to any caregiver," Sofia's continued care of her "will allow [Audrey] to continue to thrive and be raised with her half-brother," L.T. During the evaluation, Audrey "was at ease while in the care of [Sofia] and [she] looked to [Sofia] to meet her physical and emotional needs." Further, Dr. Brandwein determined that T.T. "lacks the personal and psychological stability to raise [Audrey] and reunification of [Audrey] with [T.T.] is not in [Audrey's] best interest."

During Ian and Audrey's bonding evaluation with T.T., Dr. Brandwein determined that neither child looked to her "for affection or nurturance." He also noted his concern that T.T. referred to Audrey as "crazy" on several occasions while in Ian's presence. He opined that T.T.'s "lack of consistent visitation with [Ian] and [Audrey] has caused her to have an insecure bond with both children." Due to this, "neither [child] is likely to suffer any psychological harm should their relationship with [T.T.] be severed."

The record fully supports the trial court's finding that "there is no realistic likelihood that [T.T.] or [D.B.] will be able to safely and appropriately care for their children now or in the foreseeable future." They "are unable to provide [Ian] and [Audrey] with a safe and stable home and the permanency they so desperately need and deserve." As noted by the court, neither child has ever been cared for by T.T. or D.B. and none of their other children are in their care. This ruling will allow Ian and Audrey to "receive the permanency and stability they deserve upon termination of the parental rights" of T.T. and D.B., by making Ian "legally free for adoption by [Janet]" and Audrey "legally free for adoption by" Sofia. The record amply supports the trial court's conclusion that termination of T.T.'s parental rights will not do Ian and Audrey more harm than good and is in the children's best interests.

18

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4820-18T4