# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3098-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.P.,

      Defendant-Appellant/
      Cross-Respondent.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF H.C.,
a minor,

and

IN THE MATTER OF THE
GUARDIANSHIP OF Z.H.,
a minor,

      Cross-Appellant.

_____

Submitted October 13, 2021 – Decided November 16, 2021

Before Judges Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0055-19.

Joseph E. Krakora, Public Defender, attorney for appellant (Mark E. Kleiman, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor, cross-appellant Z.H. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; David G. Futterman, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor H.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant is the mother of four children. In 2011, after receiving referrals for substance abuse, mental health issues, unstable housing, and issues with day-to-day care, the Division of Child Protection and Permanency (the Division) removed all four children from her care. Defendant appeals from the subsequent termination of her parental rights as to her two youngest

children — Z.H. (Zach), born in 2010, and H.C. (Heather), born in 2008.[1] Both children suffer from behavioral issues and have been in more than a dozen different resource homes. The trial court terminated defendant's parental rights after finding it was in the children's best interests.[2]

At the time of trial, Heather was in a resource home with a resource parent who expressed an intent to adopt her. However, the Division advised this court in September 2021 that the resource parent no longer wished to adopt Heather. Therefore, the Division changed the placement goal to select home adoption — the same goal as intended for Zach.

Defendant appeals from the trial court's decision and Zach's law guardian filed a cross-appeal. Both argue only that the Division failed to prove the fourth prong of the statutory test set forth under N.J.S.A. 30:4C-15.1(a)(4) — that the "termination of parental rights will not do more harm than good." Zach and defendant contend that Zach's prospects of adoption are too slim to justify the trial court's decision. Zach also seeks to live with his maternal grandmother D.P. (Debbie). However, Debbie was ruled out as a caretaker and has moved to South Carolina.

---

[1] We use initials and pseudonyms as required under R. 1:38-3(c)(9).

[2] The parental rights of the biological fathers of the two children were terminated in 2014. They have not participated in this appeal.

Although there is no permanent placement at this time for either child, there is also no relationship or bond between defendant and the children. Therefore, we are satisfied the court did not err in terminating the parental rights of defendant in the expectation of freeing the children for future adoptive placement. We affirm.

We provide some of the extensive history between defendant and the Division for context. Defendant's four children were removed from her care and placed into resource homes in 2011. The following year, the Family Part judge approved the Division's plan of termination of parental rights followed by adoption. After trial, the court terminated defendant's parental rights to all four children in 2014. However, while the appeal was pending, the adoptive parent of Heather and an older sibling requested their removal and they were placed into a new resource home.

We remanded for the trial court to "determine the impact of changed circumstances" regarding Heather and her sibling. After a remand trial, the court again terminated defendant's parental rights.

In August 2016, all four children were placed with Debbie. Thereafter, the case was reopened to accept defendant's voluntary identified surrender of her parental rights so Debbie and her boyfriend could adopt the children. The

4

following year, the parties consented to the reinstatement of defendant's parental rights and custody was transferred to Debbie. However, the court continued its order forbidding contact between defendant and the children until she demonstrated visitation was in their best interests.

Five months later, the Division received a referral that, after Debbie was arrested for violating a restraining order, she left the children in defendant's care. Two weeks later, Debbie left the children with another relative and had not yet returned after several days. The Division learned that Debbie had been hospitalized for depression and suicidal ideation and tested positive for cocaine and alcohol. Therefore, the children were removed from Debbie's care and placed in resource homes. The Division was again granted custody.[3]

During the trial in 2019, the Division caseworker described the myriad of services offered to defendant through the many years of litigation, including substance abuse evaluations and programs, visitation with the children, urine screens, and mental health treatment. The caseworker noted the children had not lived with defendant since they were removed from her care as very young children in 2011. She testified that neither child had ever expressed any desire for reunification with defendant.

---

[3] It appears at some point the two older siblings returned to live with Debbie.

A-3098-19

The caseworker testified that the Division considered alternatives to termination by assessing proposed relatives and family friends. However, each was ruled out either because of an unwillingness or an inability to care for the children. Debbie was ruled out as a caretaker several times — most recently the week before trial.

The Division also presented another caseworker during the trial who described the select home adoption process and explained how and why it could be beneficial to children like Zach. The caseworker stated that if Zach was "legally freed," then the Division could search beyond New Jersey for potential placements. She anticipated that Zach would remain in the treatment group home before ultimately being placed in an adoptive home. She recognized, however, that Zach's behavioral and psychological issues would create "challenges" in placing him and he would "need a supportive family who's committed to meeting his needs."

Frank Dyer, Ph.D., conducted psychological and bonding evaluations of Heather and Zach in 2019. The expert did not conduct a bonding evaluation between defendant, Heather, and Zach because they had not been in contact for over a year and neither child had resided with her since 2011.

A-3098-19

According to Dr. Dyer, he reviewed documents that revealed Zach was "an extremely emotionally disturbed child, who [had] spent a great deal of his life not only in resource care but in institutional care[,]" and that it was "clear that the necessity of transferring [him] to an institution because of his extreme behavior problems . . . made him impossible to contain in a normal resource home."

Dr. Dyer recommended that Zach "receive intensive support, therapy, supervision, and psychiatric medication management not only for the balance of his childhood but into his adolescence." He opined there was "a danger that if he's simply moved out of [the treatment group home] and then placed with an unprepared resource family, pre-adoptive family, that that's going to blow up because he needs a lot of work before he's able to accept permanent caretakers."

Dr. Dyer testified that Zach was not yet ready for adoption and that it was "going to take a while for [him] really to get the help that he needs to develop basic social-interaction skills, basic self-concept, basic behavioral controls, mood regulation, [and] emotional regulation." He recommended continued placement in a treatment home "with skilled and mature caretakers, who can respond to his behavioral challenges."

7

In discussing Heather, Dr. Dyer testified that she had some unsuccessful resource placements and spent about one year in an in-patient treatment home for "emotionally disturbed and behavior-disorder children." When Dr. Dyer met with Heather, she was staying in the resource home of a staff member from the in-patient treatment home. Dr. Dyer found Heather had "adjusted remarkably well, considering the short time that she was" at the resource home.

Dr. Dyer testified that Heather seemed "to have profited enormously from her present placement with her resource parent[,]" but she was "still an immature, very emotionally hungry and need [sic] child," which was not surprising "based on her history of institutional placements." He opined that Heather's best interests would be served by the Division's goal of adoption by her current resource parent.

Following a psychological evaluation of defendant, Dr. Dyer diagnosed her with "mood disorder not otherwise specified, bipolar disorder[,]" "borderline intellectual functioning, and personality disorder not otherwise specified with borderline and paranoid features." He explained that this "mood disorder indicates that [defendant] would have periods of either pathologically elevated mood or a pathologically depressed mood, where she essentially

would be unavailable to any child in her care." Additionally, bipolar disorder "interferes with the person's ability to grasp reality accurately[,]" and if someone refuses treatment for that it is "a really incapacitating situation in terms of any type of parenting capacity."

Because defendant refused treatment, Dr. Dyer stated her mental state "remain[ed] a serious limitation with respect to her acquiring parenting capacity any time within the foreseeable future." When asked if his opinion would change if defendant were to undergo counseling, Dr. Dyer said it would not. He explained that "any counseling she might have arranged at this late date is really too little, too late, and does not show any promise of imparting adequate parenting capacity within the foreseeable future." He also testified that neither child remembered ever living with defendant.

At the time of his evaluation, Dr. Dyer noted there was a strong attachment between Debbie and Zach. Therefore, he opined that Zach would suffer harm if the court terminated defendant's parental rights and Zach no longer had contact with Debbie and Heather. According to Dr. Dyer, because the Division's plan of select home adoption means there are no identified parents, it was unknown whether Zach would be permitted to have contact with

9

Heather and Debbie, and therefore, he did not know if this harm could be ameliorated.

However, Dr. Dyer conceded that terminating defendant's parental rights allowed the Division the freedom to place Zach in "whatever type of setting they . . . and their experts feel would be the most appropriate for him." And that was a benefit of termination. Because the decision would be in the Division's hands alone, then the Division "could be free to act in the child's best interests." Dr. Dyer also acknowledged that "some children who have extreme behavior[al] problems" may not be adopted before they turn eighteen.

Following the completion of the trial, Debbie informed the Division in February 2020 that she no longer wanted to care for the two older children and she was moving to South Carolina. As stated, the Division had already ruled Debbie out as a caretaker for Zach and Heather. The two older siblings were placed in foster homes.

In a comprehensive, well-reasoned sixty-three-page written decision, Judge Nina C. Remson terminated defendant's parental rights to Zach and Heather, finding the Division had proven each of the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.

In considering prong four, Judge Remson stated it was "unrefuted" that defendant was "not able to parent the children now or in the foreseeable future[,]" and had not been able to do so since their removal in 2011. Defendant's contact with the children had been suspended since her rights were initially terminated in 2014, and she had "yet to demonstrate that it would be in the children's best interest to allow contact." Indeed, Dr. Dyer could not conduct bonding evaluations between defendant and the children "due to the children not having contact with [defendant] for a significant amount of time."

The judge found Dr. Dyer's testimony credible, and she relied on his opinions. In addressing the Division's permanency plan for Zach—select home adoption—Judge Remson stated he had made recent progress to "step down from a residential facility to a therapeutic group home." The judge noted the caseworker's testimony that freeing Zach for adoption would provide him with a greater pool of prospective families outside of New Jersey, and Dr. Dyer's opinion that permanency was "critical" for Zach's future. Therefore, she concluded that Zach was "clearly in need of permanency as soon as possible[,]" and that any further delay in the hopes of defendant engaging in services "when she has made minimal progress would only further harm" him.

11

The court acknowledged Dr. Dyer's opinion that Zach would suffer harm if his contact with Heather and Debbie was terminated. However, she noted Dr. Dyer had also opined that Heather and Zach could not wait for defendant "to make a commitment to [engage] in appropriate services to eliminate the harms to herself and the children[,]" when, despite the passage of a decade, Debbie had failed to make any positive changes.

With the information presented to her at the time, Judge Remson also accepted Dr. Dyer's opinion that Heather had a strong attachment and bond with her resource parent and Heather would suffer harm if she were removed from her.

Therefore, the judge concluded that the Division had established the fourth statutory prong by clear and convincing evidence and termination of defendant's parental rights would not do more harm than good because the children did "not have a bond with [defendant]." She stated that termination would "afford the children the permanency and stability they need and deserve and will provide them with the best opportunity to develop into emotionally healthy and productive adolescents and adults[,]" and that Zach and Heather "deserve permanency with a competent, nurturing caretaker who can provide them with a safe and stable home."

12

In her sole argument presented on appeal, defendant contends the Division failed to prove the fourth prong of the best-interests-of-the-child test because it did not demonstrate that Zach and Heather had an opportunity for permanency that justified severing the bonds with her and Debbie. In his cross-appeal, Zach also contends that the court erred in finding that his opportunity for permanency outweighed the harm that would be caused by terminating defendant's parental rights particularly because his adoption prospects are "bleak."

The right "to raise one's children" is fundamental and thus constitutionally protected. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986) (quoting Stanley v. Illinois, 405 U.S. 645, 651 (1972)). However, while parental rights are fundamental, they "are not absolute." In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). Those rights are "tempered by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). Thus, severance of the parent-child relationship may be required to protect the child. N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008). The termination of parental rights,

however, "must be used with caution and care, and only in those circumstances in which proof of parental unfitness is clear." F.M., 211 N.J. at 447.

"The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard[,]" which is named in N.J.S.A. 30:4C-15(c) and elaborated in N.J.S.A. 30:4C-15.1(a) as four prongs. K.H.O., 161 N.J. at 347-48. They are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a)].

The Division has the burden of proving "by clear and convincing evidence that separating the child from his or her [resource] parents would cause serious and enduring emotional or psychological harm." In re

14

Guardianship of J.C., 129 N.J. 1, 19 (1992) (citing Santosky v. Kramer, 455 U.S. 745, 768 (1982)).

When applying the best interests test, "the focus of the inquiry is not only whether the parent is fit, but also whether he or she can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006) (citing J.C., 129 N.J. at 10). "Presumptions of parental unfitness may not be used in proceedings challenging parental rights, and all doubts must be resolved against termination of parental rights." K.H.O., 161 N.J. at 347 (citation omitted).

Termination should therefore be ordered only when it is "the least harmful or least detrimental alternative." A.W., 103 N.J. at 616 (citation omitted). It should be denied if the record could support a finding "that the children had not suffered substantial emotional or developmental injury, that the parents would soon resume an appropriate nurturing role with assistance from [the Division] or another agency, or that termination would affirmatively harm the children." Id. at 617.

Our review of a "trial court's decision to terminate parental rights is limited, and the trial court's factual findings should not be disturbed unless

they are so wholly unsupportable as to result in a denial of justice." In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (citations omitted). We "must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We accord "deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448.

Since the findings on the first three prongs are not challenged, we turn to the trial court's ruling on the fourth prong, where the Division must show that the "[t]ermination of parental rights will not do more harm than good" to the child. N.J.S.A. 30:4C-15.1(a)(4). This prong "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. Our Supreme Court has stated that "[t]he question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108.

The prong requires "testimony of a 'well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation'

A-3098-19

of the child's relationship with both the natural parents and the foster parents." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 281 (2007) (quoting J.C., 129 N.J. at 19). It may also be satisfied where the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the parent's] inability to care for him in the foreseeable future." N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996).

The child and their "right to a permanent, safe and stable placement," should not "be held prisoner of the rights of others, even those of his or her parents." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div. 2007) (quoting N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004)). Because of the importance of permanence to a child's well-being and development, limits are placed "on the amount of time a parent may have to correct conditions at home in anticipation of reunification." K.H.O., 161 N.J. at 358. "Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." S.F., 392 N.J. Super. at 209.

However, "[a] court should hesitate to terminate parental rights in the absence of a permanent plan that will satisfy the child's needs." B.G.S., 291 N.J. Super. at 593. Nonetheless, the Court has recognized that "there will be circumstances when the termination of parental rights must precede the permanency plan." A.W., 103 N.J. at 611.

With that backdrop, we consider defendant's argument. As to Zach, she contends it is speculative that he will find an adoptive home. Defendant relies on E.P. to support her argument. In E.P., a mother's parental rights were terminated in large part due to her "addiction to drugs, psychological problems, and unstable lifestyle." 196 N.J. at 92. The child asked to be reunited with her mother as she was moved from foster home to foster home, exhibiting behavioral problems. Id. at 95.

The Supreme Court noted that although the mother and daughter had not lived together for nine years, they "maintained a loving relationship, through periodic visits and telephone conversations." Id. at 92. The Court found that, although the evidence was sufficient to support the trial court's finding that the Division had proven the first three prongs, it erred in finding the Division satisfied the fourth prong. Id. at 104-05, 108-11.

18

The E.P. Court reasoned that this was not a case where experts differed in their opinions of whether a child was more strongly bonded to their biological parent or foster parent, but rather, the child was a thirteen-year-old, "psychologically fragile girl, who has bounced around from one foster home to another, and whose only enduring emotional bond is with her mother." Id. at 109. The Court noted that at the time of the guardianship trial, the child had been moved to her seventh foster home and there were no prospective permanent placements; at the time of the Court's decision, she had been placed in twelve different foster homes. Id. at 95, 109. The Court stated that the child's biological mother's "love and emotional support" remained "the one sustaining force" in the child's life. Id. at 109.

The Supreme Court reversed the order terminating parental rights, finding the record did not sufficiently support the conclusion that the Division proved by clear and convincing evidence that termination would not do more harm than good. Id. at 110-11. The Court reasoned that although permanency must be the Division's goal, no court or legislative authority "has stated that the unlikely possibility of permanency in the future should outweigh a strong and supportive relationship with a natural parent." Id. at 111. Thus, "because a permanent placement with an adoptive family [was] nowhere in sight and the

19

child's only enduring emotional and loving bond remain[ed] with her natural mother," the Court held it was error to find that termination would be in the child's best interests. Id. at 92-93.

Although the child in E.P., Zach, and Heather share similar behavioral issues and numerous placements without any prospects of adoption, a significant distinction is that the child in E.P. maintained contact and a loving relationship with her biological mother. Here, Zach and Heather have not had any contact or visitation with defendant for several years. Because there is no relationship at all between defendant and her two youngest children, Dr. Dyer did not conduct a bonding evaluation between the children and defendant. Zach and Heather do not even recall ever living with defendant. This simply is not the same situation as existed in E.P.

We are satisfied the record supports the trial court's conclusion that the Division satisfied the fourth prong. The children have no relationship with defendant. In addition, the evidence supports Judge Remson's conclusion that the Division sufficiently showed Debbie was not a viable caretaker option. And, after the conclusion of testimony, Debbie relocated to another state and declined any contact with the children. Debbie also requested that the Division remove the two older children from her care.

As for Heather, we must analyze her situation in light of the unfortunate circumstances that her resource parent is no longer interested in adopting her. Heather has also had more than a dozen unsuccessful placements. And her permanency situation changed after Dr. Dyer rendered his opinion and after the trial court issued its decision. However, we find a second remand would be unproductive. Without an adoptive parent, and under these circumstances, the conclusion must be the same as that regarding Zach. Because Heather has no bond with defendant, that relationship must be terminated so Heather may be free for select home adoption.

Under the circumstances of this case, there is no satisfying solution. But this litigation has taken place through the entirety of Zach's and Heather's lives. And, although there is no permanency plan in place, it is clear from the evidence presented that it is in the best interests of the children to sever the ties to defendant so they may have a chance to obtain a permanent, safe, and stable placement.

The evidence reflects that both Zach and Heather enjoyed and benefitted from sibling visits. Therefore, we remand to the trial court for the limited determination of whether post-judgment visits between Zach and Heather (and the other two siblings) may and should continue.

21

Affirmed. We remand only for the limited purpose as set forth above.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3098-19