920 A.2d 652 (2007)
392 N.J. Super. 201
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
S.F., Defendant-Appellant,
In the Matter of the Guardianship of S.L. and S.L., Minors.
Superior Court of New Jersey, Appellate Division.
Submitted March 14, 2007.
Decided April 5, 2007.
*653 Yvonne Smith Segars, Public Defender, for appellant (William J. Sweeney, Designated Counsel, on the brief).
Stuart Rabner, Attorney General, for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Lisa B. Landsman, Deputy Attorney General, on the brief).
Yvonne Smith Segars, Public Defender, Law Guardian, for the minors, S.L. and S.L. (Christopher A. Huling, Assistant Deputy Public Defender, on the brief).
Before Judges FUENTES and BAXTER.
BAXTER, J.A.D.
S.F. appeals from a June 12, 2006 order granting Kinship Legal Guardianship (KLG), pursuant to N.J.S.A. 3B:12A-6c, of her two children S.L., born September 29, 2002, and S.L., born November 17, 2003, to their paternal grandparents.[1] T.L. is the father of the older son, but the father of the younger son is unknown. T.L. consented on May 4, 2006 to the awarding of KLG to his parents, acknowledging *654 that he could not properly care for his son, and he is therefore not a party to this appeal.
S.F. argues that the court erred in awarding KLG to the paternal grandparents and contends that the evidence did not support a finding by clear and convincing evidence that such a result was warranted. The Law Guardian for both children agrees with the position asserted by S.F. and urges us to remand the matter for additional fact-finding "in light of the confusing and incomplete record developed below," which would afford all parties "an opportunity to provide additional evidence relating to S.F.'s current drug status." We disagree with these contentions, and affirm.

I.
The Division of Youth and Family Services (DYFS) first became involved with S.F. more than a decade before these proceedings began. On August 29, 1995, DYFS received a referral indicating that S.F. was addicted to drugs and had been using drugs in front of her two older children, both of whom were then in the custody of their maternal grandmother.[2] After receiving the 1995 referral, DYFS offered S.F. substance abuse treatment.[3]
Less than one year later, on April 30, 1996, DYFS received another referral, again alleging that S.F. was abusing drugs and charging that, by doing so, she had also violated her probation. The referent also claimed that the maternal grandmother was overwhelmed with the responsibilities of caring for S.F.'s two older children; however, no further action was taken by DYFS at that time. On March 10, 2003, when the older son was less than six months old, DYFS received a third referral, this one alleging that S.F. had abandoned the older son on numerous occasions without food or diapers, and left him in the care of a paternal aunt. When DYFS investigated the referral, S.F. acknowledged using drugs and DYFS again referred her to a drug treatment program, this time on an in-patient basis.
DYFS remained concerned about the older son's well-being and filed a complaint for custody, pursuant to N.J.S.A. 9:6-8.21 to -8.73. The requested relief was granted by the court on April 14, 2003. As a result of that order, the older child was placed in the physical custody of his paternal grandparents. When the younger son was born in November 2003, DYFS expressed a heightened concern for his safety because S.F. had admitted using drugs during her pregnancy. S.F. and T.L. signed a fifteen-day consent for placement, and on November 15, 2003, the younger son was also placed with his paternal grandparents.
Three weeks later, on December 8, 2003, the court granted DYFS formal legal custody of the younger son. Because the children were living with their paternal grandparents without the benefit of the permanency that adoption would confer, DYFS was required by the provisions of N.J.S.A. 30:4C-55 to file an action to implement a permanent plan for the child. Pursuant to N.J.S.A. 30:4C-61.2, a compliance review hearing was conducted on February 23, 2006. At the hearing, DYFS announced its intention to convert the then-existing complaint for custody of both boys into a complaint for KLG, and on May 4, 2006, the court granted the motion to amend the complaint charging abuse and neglect to a complaint for KLG, and *655 set the matter down for a hearing on June 12, 2006.
At that hearing, DYFS presented the testimony of Martin Yazgier, the caseworker responsible for providing services to S.F. and her two sons and for monitoring the children's well-being in the care of their paternal grandparents. Yazgier's testimony described S.F.'s history of repeatedly relapsing into substance abuse and how those relapses severely jeopardized the health and safety of her two sons, especially the older son whose autism requires intensive and highly specialized services.
Yazgier explained that although S.F. had attended in-patient drug treatment programs in 2003 and 2004, and had indeed successfully completed both of them, she thereafter relapsed and was referred to other programs. Although S.F. had received treatment at a total of "four or five programs," at the time of the KLG hearing on June 12, 2006, she was not enrolled in any after-care for her drug problem, and had not been involved in any for a considerable period of time. Yazgier described a "continual pattern of relapses" where S.F. will "do well for a few months and then relaps[e]." Despite both children being in placement for several years, he noted that "there still has been no continuous time of drug clearance and . . . no stable housing [and] no stable employment" on the part of S.F.
Yazgier also testified that S.F. had been uncooperative in providing the urine drug screens ordered by the court during the May 4, 2006 hearing. Yazgier explained that he went to S.F.'s residence on May 11, 2006 to secure a urine sample, and when no one was home, he left his business card. S.F. never contacted him in response to that visit. Yazgier again went to S.F.'s home on May 16, 2006, and again left his business card when no one answered the door. Two days later on May 17, 2006, a relative answered the door and stated that S.F. was not home and did not know when she would return. Again, Yazgier left his business card.
The next day S.F. contacted Yazgier, and they agreed that he would come to her house on May 19, 2006 for the purpose of serving her with a copy of the KLG complaint and notice of the hearing to be held on June 12, 2006. She answered the door on May 19, 2006 with a quilt on her head, indicating she was very sick and "that's why she wasn't able to [appear for the urine screens] the last couple of times."
Yazgier also testified that he had not been able to schedule a visit to her home thereafter despite his numerous requests. He summarized his frustration with S.F.'s uncooperative attitude concerning the urine screens stating, "both myself and substance abuse counselors or workers have gone out to the home on various occasions. There's been no one home, or at least, we were advised that [S.F.] was not home, and we were unable to get any random urines. There was also . . . one point . . . when [S.F.] had made an appointment to come to our office for an updated evaluation and a urine screen [but] did not appear at that time."
In addition to describing S.F.'s drug addiction, Yazgier expressed concern about the consequences of S.F.'s refusal to acknowledge that her older son has autism. He testified:
[S.F.] . . . told the State worker in Trenton . . . that she did not believe that [her older son] was autistic. She says he behaves fine around me. He smiles, and I don't think he is autistic. That statement . . . causes me some concern in that we have had [the older son] being diagnosed and treated for a considerable amount of time. He's at a specialized school, he's been evaluated by doctors, *656 by the Board of Education. He has an IEP, he has treatments, he has therapists. And for a mother to simply say, I don't think he has it, because it doesn't look like to him (sic) would give me great concern, if she was his sole caretaker as to whether or not she would have gone through all the trouble and the time that . . . [is] require[d].
After Yazgier testified concerning S.F.'s constant substance abuse relapses and the danger to her older son's well-being that resulted from S.F.'s refusal to recognize his autism, he described the "sporadic" nature of S.F.'s visits with her sons. He explained that "[s]ometimes [the visits are] canceled at the last minute, sometimes arrangements aren't made, sometimes there's no contact back and forth." He added that after "the last court hearing, which was six weeks ago," S.F. had visited with her sons "only two visits out of the six" offered to her. As to the remaining four opportunities for visitation, S.F. was unable to obtain transportation for two of them, and on the other two occasions "there was simply no contact made."
In addition to Yazgier's testimony, the Division called T.L., the older son's father, as a witness. He testified that he and S.F. used drugs together as recently as a month or so earlier, in May 2006. The paternal grandparents also testified, explaining in great detail the special programs and services they had arranged for the older son because of his autism. The grandmother explained that she was committed to raising the children to adulthood and had left her part-time job in order to devote the time necessary to caring for the children. She explained that she watches a special video every night with the older child because of his speech problem and has arranged for professional speech therapists sometimes as frequently as three times a day. She testified, "I [am] there all the time with him. I have a calendar, I keep track of everything with him. It's a lot of work . . . but I want to give them a chance in life. You know, and I'm willing to do everything I can. . . . We work as a team, we're doing the best that we can, Your Honor."
Yazgier's testimony corroborated the devotion of the paternal grandmother, and he was effusive in his praise of her efforts on the boys' behalf. He explained that whenever the children's school made any suggestions as to special programs for either child, the grandparents followed up by making an appointment, and then provided Yazgier with updates on "any medical needs or questions or problems." He described "a very close relationship" between the paternal grandparents and both children, explaining that the grandparents were always hugging the children and interacting "very well" with them.
After DYFS rested, S.F. testified, denying T.L.'s allegation that they had used drugs together a month earlier. She insisted that the last time she had used drugs was in September 2004 because of her father's death a month prior. She explained that she currently resided with her mother, was employed part-time at her mother's hairstyling shop and had received vocational training as a hairdresser. She expressed her opposition to the KLG petition and voiced her desire to have her children returned to her care.
At the conclusion of the testimony, Judge Stolte, in an oral opinion, concluded that all of the requirements of the KLG statute had been satisfied by clear and convincing evidence. She accordingly signed an order granting kinship legal guardianship and requiring supervised visitation.

II.
Unlike a guardianship initiated by DYFS pursuant to N.J.S.A. 30:4C-15.1a, *657 kinship legal guardianship does not terminate parental rights. Instead, the purpose of this alternative legal arrangement is to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them and when adoption is neither feasible nor likely. N.J.S.A. 3B:12A-1; N.J. Div. of Youth and Family Servs. v. P.P., 180 N.J. 494, 508, 852 A.2d 1093 (2004). Although the kinship legal guardian is responsible for the care and protection of the child and must provide for the child's health, education and maintenance until the child reaches eighteen or becomes emancipated, whichever occurs later, N.J.S.A. 3B:12A-4(a)(6), the child's parents remain obligated to pay child support, N.J.S.A. 3B:12A-4(a)(3), and retain the right to visitation, N.J.S.A. 3B:12A-4(a)(4). P.P., supra, 180 N.J., at 508, 852 A.2d 1093.
In order for the court to appoint a care-giver as kinship legal guardian, the court must be satisfied by clear and convincing evidence that:
(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;
(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
(3) in cases in which [DYFS] is involved with the child . . . (a) [DYFS] exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and
(4) awarding kinship legal guardianship is in the child's best interests.
[N.J.S.A. 3B:12A-6d.]
Although the right of a parent to enjoy a relationship with his or her child is of constitutional dimension, N.J. Div. of Youth and Family Servs. v. C.S., 367 N.J.Super. 76, 109-10, 842 A.2d 215 (App. Div.), certif. denied, 180 N.J. 456, 852 A.2d 192 (2004), parental rights are not absolute. In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999). "A child is not chattel in which a parent has an untempered property right." C.S., supra, 367 N.J.Super. at 110, 842 A.2d 215. Children must not languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement. Id. at 111, 842 A.2d 215. In response to the reforms resulting from the Federal Adoption and Safe Families Act of 1997,[4] "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.
Both S.F. and the Law Guardian argue that the factual findings of the trial judge were unsupported by credible evidence, and the order granting KLG is contrary to the best interests of both boys. In evaluating these arguments, we do not write on a clean slate. Review of a trial court's grant of guardianship is limited. N.J. Div. of Youth and Family Servs. v. M.M., 189 N.J. 261, 278, 914 A.2d 1265 (2007). We will not disturb the factual findings of the trial judge unless they are unsupported by adequate, substantial and credible evidence in the record. Id. at 279, 914 A.2d 1265. "Deference is especially appropriate when the evidence is largely *658 testimonial and involves questions of credibility" because the trial court has the benefit of seeing and hearing the witnesses and determining whether they are believable. C.S., supra, 367 N.J.Super. at 112, 842 A.2d 215, (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117, 693 A.2d 92 (1997)). Judge Stolte presided over the proceedings involving S.F. and her children from the time the Title 9 proceeding was first filed. Her lengthy involvement with the parties has resulted in a thorough grasp of the facts and a keen appreciation of their significance.
A. The first prong
The first prong requires a showing by clear and convincing evidence that S.F.'s incapacity is of such a serious nature as to demonstrate that she is unable or unwilling to perform the regular and expected functions of raising a child. N.J.S.A. 3B:12A-6d(1). The record amply supports the judge's findings that: S.F. has been addicted to drugs since 1995; she had used drugs before and during her pregnancy with her older son and continued to do so after he was born on September 29, 2002; she had successfully completed numerous in-patient and out-patient drug treatment programs, but ultimately such efforts were unsuccessful as demonstrated by S.F.'s numerous relapses; one such relapse occurred as recently as one month prior to the June 2006 trial; S.F. was so uncooperative with DYFS's efforts to obtain court-ordered drug screens in May 2006 that no urine samples were ever able to be obtained and overnight visitation with her children could never be reinstated; S.F. was not enrolled in any after-care for her drug problem in June 2006, notwithstanding a strong need for such treatment; and S.F.'s protracted and intractable drug addiction adversely impacted her "ability to parent the children on a day-to-day basis."
There is also strong support in the record for the judge's findings that S.F. had taken no interest in her sons' day-to-day activities; had made no effort to find out from the boys' caregiver, their paternal grandmother, "what happens everyday with them, how they're doing at school, how they're doing at home"; had taken no "affirmative actions" to address her older son's autism; had visited her children only sporadically and had "no real involvement in [their] lives."
We agree with Judge Stolte's ultimate conclusion that S.F.'s drug addiction, when combined with her lack of involvement in her children's lives, demonstrated by clear and convincing evidence an "incapacity . . . of such a serious nature as to demonstrate that [S.F.] is unable, unavailable or unwilling to perform the regular and expected functions of care and support" of her two children. N.J.S.A. 3B:12A-6d(1). Unquestionably, the first prong is satisfied.
B. The second prong
The second prong requires proof that the parent's inability to perform the required parenting functions is unlikely to change in the foreseeable future. N.J.S.A. 3B:12A-6d(2). Our evaluation of the evidence supporting the second prong, or element, recognizes that the conduct satisfying the first prong, "informs and may support" the second element. In re Guardianship of DMH, 161 N.J. 365, 378-79, 736 A.2d 1261 (1999).[5] In reviewing the evidence supporting the second prong, *659 Judge Stolte concluded that during the two and one-half years that had elapsed between the filing of the Title 9 abuse and neglect proceedings in January 2004 and the KLG proceedings in June 2006, "there has not been a tremendous change in the spot that we were at." As the judge commented, S.F. had made "no real push" to overcome her drug problem or become more involved in her children's lives. Accordingly, the judge's conclusion that the evidence demonstrated by clear and convincing evidence that S.F.'s inability to parent her children would not change in the foreseeable future finds strong support in the record.
C. The third prong
The third element required by the KLG statute requires DYFS to prove that it made reasonable efforts to provide services to help the parent correct the circumstances that initially led to the removal of the children and that adoption is neither feasible nor likely. N.J.S.A. 3B:12A-6d(3). The Division's efforts on behalf of a parent are "not measured by their success." DMH, supra, 161 N.J. at 393, 736 A.2d 1261. The failure of a parent to become an effective caretaker for her children is not determinative of the sufficiency of DYFS's effort at family re-unification. Ibid. We agree with Judge Stolte's findings that DYFS made substantial efforts both to effectuate re-unification and to provide services to S.F. designed to help her function effectively as a parent. In particular, DYFS provided substance abuse evaluations, substance abuse referrals, psychological evaluations, daycare assistance, transportation and facilitated the visitation between S.F. and her sons.
DYFS also properly explored whether adoption of these two boys by their paternal grandparents was feasible or likely. The paternal grandparents, although very committed to the care of both boys, are not willing to adopt them and wish to proceed with KLG. Accordingly, Judge Stolte's conclusion that DYFS proved by clear and convincing evidence that reasonable efforts were made to reunite the family and that adoption is neither feasible nor likely is based on substantial, credible evidence in the record. We agree with her finding that the third prong was satisfied.
D. The fourth prong
The fourth prong requires a finding by clear and convincing evidence that awarding kinship legal guardianship is in a child's best interests. N.J.S.A. 3B:12A-6d(4). We concluded in N.J. Div. of Youth and Family Servs. v. S.V. that kinship legal guardianship is indeed in a child's best interests when a parent's inability to properly parent a child is unlikely to change in the foreseeable future, and the child is in the care of a loving family member unwilling to adopt the child. 362 N.J.Super. 76, 88, 826 A.2d 821 (App.Div. 2003). Here, similar to the circumstances in S.V., the trial court properly concluded that both boys are in "a very good, nurturing, solid, permanent home" and "the paternal grandparents have provided that stability for the children." Both children have lived continuously with their paternal grandparents, and it is the only home that they have ever known. The judge's finding that the paternal grandparents were extraordinarily dedicated to the well-being of these two children, and that they were particularly attuned to the older son's need for specialized care and treatment due to his autism, finds strong support in the record.
We also agree with the judge's finding that S.F.'s refusal to believe her older son is autistic demonstrates that it is in his best interest to live with his grandparents, who do recognize his autism and have continuously *660 expended substantial effort to ensure that he receives the services he needs. Judge Stolte's conclusion that the "children are thriving" in the care of their paternal grandparents satisfies the requirement of the fourth prong that it is in the children's best interests that KLG be granted.
These two children cannot wait for their mother to "get herself together." C.S., supra, 367 N.J.Super. at 113, 842 A.2d 215. The harm to children that results from a delay in achieving permanency and stability requires that limits be placed on the amount of time granted a parent to correct her unfitness in anticipation of a possible future reunification with her children. K.H.O., supra, 161 N.J. at 357-58, 736 A.2d 1246. As we have said, these two boys "cannot be held prisoner[s] of the rights of [their mother] . . . [and they] have their own rights, including the right to a permanent, safe and stable placement." C.S., supra, 367 N.J.Super. at 111, 842 A.2d 215.
Judge Stolte carefully and properly found the facts and reached proper conclusions of law. We agree with her ultimate finding that the evidence abundantly warranted the conclusion that kinship legal guardianship of these two boys should be awarded to the paternal grandparents.
Affirmed.
NOTES
[1] Because the initials of both children are the same, we refer to them respectively as "the older son" and "the younger son."
[2] Those two children remain in the custody of their maternal grandmother, and neither child's status is a part of this appeal.
[3] The record does not reflect whether such treatment was pursued.
[4] 42 U.S.C.A. § 301, 671(a)(16), 675(5)(A)(ii).
[5] The elements required by N.J.S.A. 3B:12A-6 as a basis for kinship legal guardianship mirror the best interests standard for termination of parental rights found at N.J.S.A. 30:4C-15.1. P.P., supra, 180 N.J. at 509, 852 A.2d 1093. Accordingly, it is reasonable to apply the decisional law applicable to N.J.S.A. 30:4C-15.1 to KLG cases as well.