# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2614-20

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

L.S.,

     Defendant-Appellant,

and

D.Y., II,

     Defendant.

_____

IN THE KINSHIP MATTER OF
R.S., a minor.

_____

Submitted May 9, 2022 – Decided August 30, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FL-20-0013-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; John J. Lafferty, IV, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Nancy P. Fratz, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.S. (Layla) appeals from the April 29, 2021 judgment granting kinship legal guardianship (KLG) of her biological daughter, R.S. (Rory), to Layla's brother, M.S. (Marco), and his girlfriend, D.G. (Diane).[1] Defendant D.Y., II (Daniel), Rory's biological father, was incarcerated prior to and

---

[1] We use initials and pseudonyms for the parties and the child to protect their privacy. R. 1:38-3(d)(12). Because Layla and some of the witnesses who testified at the KLG trial share the same surname, we use first names throughout the opinion. We intend no disrespect by this informality.

throughout the KLG trial; he does not challenge the judgment. Also, Layla's other daughter, C.T. (Cali), is not involved in this appeal.[2]

I.

In September 2017, one day after Rory's premature birth, the Division of Child Protection and Permanency (Division) received a referral about Layla testing positive for marijuana. When the Division interviewed Layla, she admitted to smoking marijuana a month prior to giving birth. She agreed to cooperate with the Division, submit to psychological and substance abuse evaluations, and comply with recommendations resulting from the assessments.

Rory remained hospitalized for approximately two weeks after she was born to be treated for conditions related to her premature birth. She was released to Layla's care once the Division confirmed Layla would continue to live with Marco and Diane.

During Layla's substance abuse evaluation in October 2017, she tested positive for THC; the Division recommended she attend an outpatient substance abuse program at Trinitas Regional Medical Center. Although Layla attended

---

[2] Cali lives in Puerto Rico with her paternal grandmother.

A-2614-20

her intake appointment, she failed to pursue treatment at Trinitas and was discharged from the program.

In November 2017, Layla was stopped by the police on outstanding warrants. She was arrested after the police found she was in possession of heroin, cocaine, and a loaded handgun.[3] Layla's arrest prompted another referral to the Division, and the Division filed a complaint for temporary custody of Rory.

In December 2017, the trial court granted the Division's request for custody, permitted Rory to remain in the physical care of Marco and Diane, ordered Layla to have liberal visits with Rory — supervised by the couple — and directed Layla to complete a psychological evaluation and attend a substance abuse program at Trinitas. Layla relocated to her grandmother's home pending resolution of her criminal charges.

During the following year, the Division offered various services for Layla, including family team meetings, a psychological evaluation, individual therapy, and substance abuse treatment. In April 2018, Layla again tested positive for

---

[3] The gun, a Beretta model 950, was concealed in Layla's bra. When it fell to the ground during her arrest, the hammer was cocked back, with a bullet in the chamber and seven rounds in the magazine.

THC.  Within the next couple of months, she was terminated from her substance abuse treatment program due to noncompliance.

Layla pled guilty to her pending criminal charges and was sentenced in December 2018 to the Edna Mahan Correctional Facility (EMCF).  She remained incarcerated until December 2019.  During her incarceration, the Division arranged for Rory to be transported to EMCF to ensure Layla had ongoing visits with the child.[4]

## II.

Although it first rejected the Division's permanency plan for termination of defendants' parental rights, the trial court approved that plan in March 2019. Two months later, the Division filed a guardianship complaint to terminate defendants' parental rights and allow Rory to be adopted by Marco and Diane.

In December 2019, Layla was released from prison and transitioned to a residential substance abuse program at Eva's Village.  Shortly thereafter, Layla obtained employment at ShopRite and resumed visiting Rory under the supervision of Marco and Diane.

---

[4]  The Division also coordinated visits between Daniel and Rory while he was incarcerated.

A-2614-20

In February 2020, Layla's psychological expert, Dr. Kinya Swanson, conducted bonding evaluations between Rory and Layla, and between Rory and Marco and Diane. Dr. Swanson also performed a psychological evaluation of Layla.

Following her assessments, Dr. Swanson opined there was "evidence of a developing healthy bond and attachment" between Layla and her daughter. She also found "evidence of a healthy bond between" Rory and Marco and Diane and concluded they were Rory's "psychological parents." The doctor determined KLG was preferable to Rory being adopted by Marco and Diane even though they wished to adopt Rory at that time. Dr. Swanson opined Layla "had the potential to become a suitable parent in the foreseeable future."

Regarding Layla's psychological evaluation, Dr. Swanson noted Layla scored low in her cognitive testing; the doctor recommended re-testing. She also diagnosed Layla with cannabis use disorder and "moderate and unspecified personality disorder with turbulent and compulsive features." Dr. Swanson found Layla demonstrated a pattern of denial, poor judgment, poor planning, and insufficient coping skills. When the doctor tested Layla regarding her parenting attitudes and potential for child abuse or neglect, Layla scored in the

A-2614-20

"medium risk range" in four out of five categories, and the "highest range" for the fifth category.

During Dr. Swanson's subsequent evaluation of Layla in October 2020, she concluded Layla "had stabilized with regard to her finances [and] maintained employment." By then, Layla was living with one brother, L.S. (Larry), and working for two other brothers, J.S. (Joe) and C.S. (Cary), as a maid and secretary, respectively. Layla told Dr. Swanson if reunification occurred, "her plan was to continue to allow [Diane] to continue to watch [Rory]. . . . But [Layla] . . . noted . . . she had several brothers who had wives who were available for childcare as well."

Dr. Swanson concluded Layla did not test positive for illicit drugs from the time she entered Eva's Village in December 2019 through September 2020. Further, the doctor observed Layla's "updated progress notes from service providers all were positive and . . . she was . . . participating and . . . progressing . . . as expected." Although Dr. Swanson determined Layla's parenting ability had improved, she did not recommend reunification because Layla still "did not present as [Rory's] psychological parent."

Dr. Swanson opined Layla could "become [Rory's] psychological parent over time" and should have "time to build . . . her bond with" Rory. The doctor

7

recommended Layla participate in a "probationary period from nine to [twelve] months at that time . . . to assist in the transition" of becoming Rory's psychological parent, and that Layla "immediately have liberal unsupervised visits" to "include some overnight and weekend visits."  Dr. Swanson opined

> permanency was less critical for these particular circumstances . . . because [Rory has] a stable situation. She's doing well. . . .  She can do visits with her birth mother. . . .  But there's not a sense of urgency with regard to [Rory's] psychological health.

Notably, after reevaluating Layla in October 2020, Dr. Swanson found Layla "did not show any significant improvement across any of her parenting concepts" in terms of her risk for child abuse and neglect.  Instead, Layla "again scored the same medium and high-risk rating."

In March 2020, the Division's expert, Dr. Robert Kanen, conducted bonding evaluations between Rory and her resource parents and between Rory and Layla.  He also performed a supplemental evaluation in November 2020.

Based on his initial evaluation, Dr. Kanen concluded Rory viewed Marco and Diane as her parents, having lived her entire life with them.  Further, he expressed concern about Layla's marijuana usage and her arrest.  When he asked Layla about her arrest and why she possessed a gun, she told him she needed it

for protection because she was selling drugs. Layla also informed Dr. Kanen she planned to raise Rory with Daniel.

Dr. Kanen stated Layla did "poorly" on cognitive tests, had "very low verbal comprehension, maybe fourth or fifth percentile[,] [and had v]ery low perceptual reasoning ability, roughly in the same percentile." Additionally, he found Layla's working memory was "lower [on] average," making her prone to "very poor judgment . . . [and] decision-making."

When Dr. Kanen re-evaluated Layla in November 2020, she scored "lower in the personality testing" and exhibited "cognitive limitations." He found her to be "unreliable, undependable, [and] struggling through functioning daily." Additionally, he concluded she would "have difficulty providing the child with a permanent, safe, and secure home independently," despite not showing evidence of "a drug problem at that time." Dr. Kanen further opined Layla's cognitive limitations "impair[ed] her ability to . . . teach and supervise a child, [and] to maintain reliability, consistent predictability and care."

According to Dr. Kanen, when he asked Layla about her relationship with Marco, she initially described it as "good," but later characterized this relationship as "bad." Dr. Kanen opined Layla "didn't really have any appreciation for what [Marco] was doing for her," and noted if Layla was

9

reunified with Rory, she planned to live in her grandmother's home and have Diane care for Rory while she was working. Dr. Kanen observed Layla "wanted to independently take care of [Rory], but she is still going to be dependent on [Marco and Diane] for childcare."

Regarding the results of his bonding evaluations, Dr. Kanen stated that after Layla arrived late to the first evaluation, Rory "turned away from her [and] avoid[ed] her," despite Diane's attempts to encourage Rory to interact with her mother. Additionally, he observed as Rory spent more time with her mother, she became more comfortable with Layla, but did not call her "mommy." Dr. Kanen found the interaction between mother and daughter was "a sign of an impaired attachment." He explained, "[a]ttachment is . . . largely life experience that happens with the child. So [Rory's] expectations of [her] mother are basically not to be available."

Following a second bonding evaluation in November 2020, Dr. Kanen observed Rory still demonstrated an "impaired attachment" to her mother. He also noted Layla "struggl[ed] to provide" Diane's address, despite having lived with Diane. Layla admitted she would "get lost on the way to this address all the time," leading the doctor to conclude her inability to "recall an address where [she had] lived . . . just fits into the overall picture of . . . having cognitive

10

limitations, . . . memory impairment," and being "unreliable and undependable." Such lack of recall was "consistent with [her] difficulty [in] providing a child with a permanent home." Dr. Kanen determined Layla would "not really" benefit from therapy and counseling, because she had to be "motivated," and "the effectiveness [of therapy and counseling] is weak for . . . people who have these sorts of problems."

After Dr. Kanen conducted a bonding evaluation among Marco, Diane and Rory in March 2020, he found the couple was "very stable" and dedicated to Rory. He concluded Rory viewed them as "predictable, consistent, and nurturing" and the child was "very attached" to both. Rory viewed Marco as "her father" and "basically perceived [Diane] as her mother."

In December 2020, the trial court accepted the Division's amended permanency plan of "KLG with a relative." Accordingly, the judge entered an order on December 3, 2020, dismissing the pending guardianship complaint and reinstating the former child protection case. Also, the judge ordered Layla to "immediately submit to a urine screen." Additionally, he directed visitation should be "liberal, supervised by Division-approved supervisors" and overnight visits should "commence on a self-executing basis, at the discretion of the

Division case manager."  Two months later, the Division filed the appropriate KLG petition.

III.

The KLG trial commenced and concluded in April 2021.  The Division presented the testimony of its caseworker, Fay Rispaldo, and its adoption worker Tawanna Stanley.  It also called Dr. Kanen and Marco to testify.  Layla testified on her own behalf and presented testimony from her brother, Joe, as well as Dr. Swanson.  The Law Guardian called no witnesses but supported the Division's request for KLG.

During Rispaldo's testimony, the caseworker recounted the Division made four referrals for Layla to receive substance abuse treatment, including two referrals to Trinitas; Layla did not complete any of the substance abuse programs recommended to her.  Rispaldo confirmed the Division also offered Layla substance abuse and psychological evaluations, arranged for Layla to receive individual therapy, facilitated family team meetings for her benefit, and coordinated visits between Layla and Rory.

Rispaldo stated that while she handled the case throughout 2018, Layla's visits with Rory, and her contacts with the Division were "inconsistent." Additionally, Rispaldo noted Layla initially agreed Rory should be placed with

12

Marco, but Layla changed her mind before her incarceration. Rispaldo also testified Marco and Diane now wanted to pursue KLG, versus adoption.

Stanley, the Division's adoption worker, testified Layla participated in substance abuse treatment after transitioning to Eva's Village in December 2019. But staff from Eva's Village was concerned about Layla's "mental health and substance abuse problems," as well as her "job[] skill set . . . and . . . coping skills." Further, Stanley stated neither Marco nor Diane created barriers to Layla visiting Rory, yet Layla's visits were "inconsistent."

During the trial, the judge asked Stanley if Layla was capable of being Rory's custodial parent; Stanley replied, "[a]t this point, no." The adoption worker explained that Layla failed to undergo a urine screen specifically requested by the Division in December 2020, adding, "in over three months she has not submitted to even one random urine screen." Additionally, Stanley expressed concern Layla had no specific childcare plan for when she was working; she concluded Layla needed more time "to continue with her sobriety and stabilization with her home and . . . job."

Drs. Kanen and Swanson also testified. Both experts testified consistent with the results of their psychological and bonding evaluations.

 A-2614-20

When Marco took the stand, he testified he had "no problem" with Layla coming to his home for visits and "never, ever held her back from coming to [his] home." He also stated he and Diane would bring Rory to visit Layla on weekends but when Layla went to his home for supervised visits, she "maybe came for [twenty], [thirty] minutes at best." Further, Marco stated he understood the difference between KLG and adoption and that, in the future, Layla could seek "more visitation or custody back." Marco testified he did not "want to hold [Rory] from her mom for a long period of time . . . [b]ut at this present time, [Layla's] not ready." Accordingly, Marco believed it was "appropriate . . . [to] move forward with [KLG]," and he represented he and Diane were prepared to "maintain custody of" Rory.

Layla's brother, Joe, testified next. He confirmed Layla worked as his maid and he paid her $100 per week. Joe stated Layla was living with their brother, Larry, and working for another brother, Cary, at his towing company.

Layla was the last witness to testify. She acknowledged the Division asked her to complete a drug screen in December 2020, but she believed the request stemmed from Marco's suspicion she was smoking marijuana. Her attorney asked her, "why didn't you just do the screen?" Layla stated, "I could do the screen, it's not a problem, but [I] just felt like every time [Marco] says

something, I'm . . . getting calls [from] his family." The judge interjected, "there's a question. Why didn't you do the screen in December?" He then noted, "[t]he witness is not answering." The following exchange occurred:

> [LAYLA'S ATTORNEY]: [Layla], are you currently smoking marijuana?
>
> [LAYLA]: No.
>
> THE COURT: Then why don't you do the screens?
>
> [LAYLA]: I will do the screens.
>
> THE COURT: Let's just mark the date. It's April the [ninth] and these screens have been ordered since December [2020]. . . . The Division has changed its plan from termination of parental rights to [KLG] . . . . And I'm just mystified as to why [Layla] wouldn't try to demonstrate that she is clean, that she is ready to parent the child instead of just ignoring the court order to have . . . [] drug screens.

## IV.

On April 29, 2021, following summations from counsel, the judge rendered an opinion from the bench. He found by clear and convincing evidence KLG should be awarded to Marco and Diane.[5] The judge accepted Rispaldo's testimony that before Layla was incarcerated, she was "inconsistent in following

---

[5] Because Daniel does not challenge the April 29 judgment, we address the judge's findings only as they relate to Layla.

up [on] her individual therapy" and "inconsistent with maintaining contact with the Division." The judge also credited Stanley's testimony that Layla was "inconsistent" in visiting Rory at Marco and Diane's home, despite their efforts to have Layla engage with Rory. Additionally, the judge credited Stanley's testimony that both Marco and Diane consented to KLG.

In addressing the testimony of Layla's brothers, the judge remarked Layla "has three brothers who are pretty stable guys from the evidence I've seen. That's a . . . circumstance that's very valuable to" Layla. He also determined Marco was "very sincere and interested" in Rory and wanted Layla to remain involved in Rory's life. Additionally, while the judge acknowledged Joe stated Layla "was more stable than ever," the judge found there was

> no denying that [Layla's] misjudgment put her in a horrible situation with respect to . . . [Rory] in the sense that she was away — incarcerated. . . . She was arrested with a gun. She had the gun because she was selling heroin and cocaine. This is within two months of the child's birth. That's . . . pretty significant and we want to make sure that if custody . . . ever go[es] back to [Layla] . . . all the ducks are in line, so to speak.

Turning to Layla's testimony, the judge concluded she was working for her brothers. Further, he stated Layla "had not visited the child regularly, even in the recent months. And apparently this was due to the ill feeling she now has against . . . [Marco and Diane]. That's an[] example of misjudgment." The

16

judge also concluded Layla's unwillingness to exercise visitation when supervised in Marco and Diane's home "demonstrate[d Layla's] cognitive limitations."

Regarding Layla's substance abuse history, the judge noted Layla refused to submit to court-ordered drug screens, and her refusal continued throughout the trial. He recalled that at trial, he "asked her . . . why she failed to do drug screens that were court ordered" and "she admitted that she had not done the drug screens because she felt her brother, [Marco], was wrongfully suggesting that she was still involved in drug use." The judge found her position made "no sense," adding, "[i]f you want to prove that your brother is wrong and he's wrongfully accused you, . . . do the drug screen. That's . . . lack of judgment . . . . That's gross immaturity."

In addressing the testimony presented by Drs. Kanen and Swanson, the judge deemed both experts credible and he concurred with their conclusion Layla suffered from cognitive limitations. After acknowledging "there were subtle differences" in their respective opinions, the judge summarized the testimony of each expert.

Referring to Dr. Kanen, the judge found the doctor's "assessments and testimony . . . credible and helpful to . . . the court with insights as to where this

17

case should go." The judge accepted Dr. Kanen's conclusion "it would be difficult for [Layla] to effectively raise a child due to her cognitive level." The judge also agreed with the doctor that Layla "had no insight into her deficits." Additionally, the judge noted Layla admitted to Dr. Kanen that when she was arrested in 2017, she possessed a gun because she was selling heroin and cocaine. He found her conduct evidenced a "massive sign of immaturity," particularly given Rory was an infant and in Marco's care at the time. The judge stated, "it's uncertain if" such a "gross judgment problem . . . has been completely resolved."

Turning to Dr. Kanen's bonding evaluations, the judge accepted the doctor's finding that although Rory was comfortable with Layla, the child's attachment to her mother was "impaired." The judge determined the "damage" to the mother-daughter relationship "was done early, simply because of [Layla's] absence." Similarly, the judge credited Dr. Kanen's assessment of the bond between Rory and Marco and Diane as "strong," finding Rory was "very happy with them and . . . they are . . . caring parents."

Regarding Dr. Swanson's testimony, the judge stated she presented as "very thoughtful and credible also." He viewed the results of her evaluations as demonstrating Layla's "parenting ability was impaired and that she was not

ready for reunification." He concluded, "that's a problem for [Rory,] who deserves permanency."

Describing the results of Dr. Swanson's first evaluation, the judge noted she found Marco and Diane were Rory's psychological parents, and she "agreed with the plan of [KLG]." Although the judge recognized Dr. Swanson found Layla "more cooperative" in the October 2020 evaluation and that the doctor stressed Layla's "urine screens up through September [2020] were clear," the judge stated

> Dr. Swanson was unable to say what a urine screen [would] show . . . following September.
>
> And I will get into this, the lack of maturity and judgment on not doing [the screen]. If you want to get your child back into your care, wouldn't you do a court-order[ed screen] to demonstrate well, "they want a drug test, fine, I'm not using drugs, I'll do it?" But that lack of judgment, . . . that continues . . . right up until the time of this trial. . . . It's really uncertain . . . whether that's going to . . . ever [be] resolved . . . to make the mother a safe and healthy parent.

As for Dr. Swanson's expectation Layla could become Rory's psychological parent in the nine- to twelve-month-period following her second evaluation, the judge deemed this opinion "speculative." But he credited Dr. Swanson's finding reunification was not appropriate "because [Layla's] not the psychological parent."

19

Next, the judge itemized the four-prong test under N.J.S.A. 3B:12A-6(d), and stated, "I do find by clear and convincing evidence that [KLG] is fully supported by the evidence." Regarding the first prong, the judge found that when Rory was placed with her resource parents, Layla was recommended for "level one treatment" to address her substance abuse issues, but was arrested approximately two months later on gun and drug charges. The judge concluded Layla not only failed to comply with level one treatment, but before she was incarcerated in December 2018, she was "inconsistent in following up [with] her individual therapy," and "inconsistent with maintaining contact with the Division." He added, "[t]he mother . . . has been incarcerated for much of the child's life, though she is now free of incarceration."

Given these facts, the judge stated Layla

> continues to demonstrate an unhealthy thought process [and] does not seem to appreciate that her child has been living with her brother for three and a half years . . . . I specifically find . . . she has been . . . continuously unrealistic about the reality that her conduct has triggered.

He also found Layla − along with Daniel − "demonstrated an incapacity that is now of such serious nature that . . . they are unable to perform the expected functions of raising a child."

Similarly, the judge found the Division met its burden in establishing the second statutory prong under N.J.S.A. 3B:12A-6(d), i.e., Layla was unable to perform the regular and expected functions of care and support of Rory and this circumstance was unlikely to change in the foreseeable future. He referenced Dr. Swanson's expectation Layla could become Rory's psychological parent within a year, and stated:

> I'm not convinced that is the case and that's why prong two [under N.J.S.A. 3B:12A-6(d)] is met. . . .
>
> [Layla's] lack of judgment in not doing the drug test, not doing consistent visiting, testifying the way she did[, and] . . . displaying her inability to understand the exact circumstance of where she is. That is what satisfies . . . by clear and convincing evidence that prong two is met by the Division's proof.

He further remarked Layla "has some significant work to do . . . to establish a meaningful relationship with her daughter and demonstrate . . . she is capable of safely raising this child or any other child."

Turning to the third prong, the judge was convinced the "resource parents have evaluated and considered . . . adoption." He noted Marco "testified that he [is] satisfied with . . . kinship legal guardian status." Further, the judge found Rory's adoption was neither feasible nor likely, stating, "the test for termination of parental rights would be unlikely to be met at this time and if that were to be

pursued, permanency would be unacceptably delayed for this child." He added, "I do not find that termination of parental rights is feasible."

Finally, the judge considered the fourth statutory prong under N.J.S.A. 3B:12A-6(d) and stated, "[c]learly, the evidence overwhelmingly supports . . . [KLG]." The judge noted Rory was "living with the only psychological parents . . . she has ever known. This has continued for three and a half years, which many consider the most important years." Further, the judge concluded Rory "is entitled to continue to live with her present relative resource parents where she has been able to enjoy the benefits of a stable and loving household."

V.

On appeal, Layla presents the following arguments for our consideration:

POINT I

THE TRIAL COURT'S LEGAL CONCLUSION THAT [THE DIVISION] PROVED THE FOUR STATUTORY PRONGS FOR KLG BY CLEAR AND CONVINCING EVIDENCE WAS IN ERROR AND MUST BE REVERSED.

A. The Trial Court Erred in Finding [the Division] Clearly and Convincingly Proved Layla's Incapacity Was of Such a Serious Nature as to Demonstrate She Was Unable, Unavailable, or Unwilling to Perform the Regular and Expected Functions of Care and Support of [Rory].

22

1. Incarceration Alone Does Not Support the Permanent Interference with a Parent's Relationship with Her Child: Layla Completed Her Sentence and Post-Release Requirements; She Had No Prior or Subsequent Criminal History

2. Layla's Past Marijuana Use, Which Was in Remission More Than a Year Prior to Trial, is Now Legal and Can No Longer Be the Sole Basis for the State's Interference with Her Parental Rights.

3. It is Unconstitutional to Permanently Interfere with a Parent's Right to Her Child Because the Parent Has a Low IQ.

B.  The Trial Court Erred in Finding [the Division] Clearly and Convincingly Proved Layla's Inability to Perform the Regular and Expected Functions of Care and Support of Her Child Was Unlikely to Change in the Foreseeable Future.

C. The Trial Court Erred in Finding [the Division] Clearly  and Convincingly Proved it Exercised Reasonable Efforts to Reunify [Rory] with Layla and that These Efforts Were Unsuccessful or Unnecessary.

D. The Trial Court Erred in Finding [the Division] Clearly and Convincingly Proved KLG Was in [Rory's] Best Interests.

POINT II

THE TRIAL COURT DEPRIVED LAYLA OF HER RIGHT TO DUE PROCESS BECAUSE IT (1) IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF FROM [THE DIVISION] TO HER AND (2)

23

IT GROSSLY INTERFERED WITH THE PRESENTATION OF THE DEFENSE'S CASE. (Not Raised Below).

A.   The Trial Court Improperly Required Layla to Demonstrate by Clear and Convincing Evidence that (1) She Was Capable of Parenting or Would Be Able to Do So in the Foreseeable Future; That (2) [the Division] Did Not Make Reasonable Efforts to Reunify Her With Her Daughter; and (3) KLG Was Not in [Rory's] Best Interests.

B.   The Trial Court Grossly Interfered with the Proceedings Below, Particularly as it Relates to the Defense's Presentation of its Case.

These arguments lack merit.  R. 2:11-3(e)(1)(E).  Accordingly, we affirm substantially for the reasons expressed by the judge in his oral opinion.  We add the following comments.

Our "[r]eview of a trial court's grant of guardianship is limited."  N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div. 2007) (citing N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 278 (2007)). "We will not disturb the factual findings of the trial judge unless they are unsupported by adequate, substantial and credible evidence in the record."  Ibid. (citing M.M., 189 N.J. at 279).  This is because the judge has the opportunity to see and hear the witnesses as they testify and determine "whether they are believable."  Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J.

Super. 76, 112 (App. Div. 2004)).  A judge's purely legal conclusions, however, are subject to our plenary review.  Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007).

Parents have a constitutionally protected right to the care, custody, and control of their children.  In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); see also S.F., 392 N.J. Super. at 209.  But the constitutional right to the parental relationship is not absolute.  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 553 (2014) (citing K.H.O., 161 N.J. at 347).  As such, "[c]hildren have their own rights, including the right to a permanent, safe and stable placement."  C.S., 367 N.J. Super. at 111.

The standards that guide a court in the appointment of a KLG are like those for the termination of parental rights set forth under N.J.S.A. 30:4C-15.1. Prior to granting a KLG, a judge must find the Division has proved by clear and convincing evidence that:

> (1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;
>
> (2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;
>
> (3) in cases in which the [D]ivision is involved with the child . . . (a) the [D]ivision exercised reasonable efforts

25

to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely;[6] and

(4) awarding [KLG] is in the child's best interests.

[N.J.S.A. 3B:12A-6(d).]

As our Supreme Court observed years ago,

unlike adoption, "an order or judgment awarding [KLG] may be vacated by the court prior to the child's [eighteenth] birthday if the court finds . . . [KLG] is no longer in the best interests of the child," or if the parent has regained the ability to care for the child and termination of the guardianship is in the child's best interests.  N.J.S.A. 3B:12A-6(f). . . .

"Such a guardianship is clearly intended to formalize the status of a relative who agrees to take on responsibility for a child . . . .  Unlike a judgment terminating parental rights, [KLG] would not cut off the legal relationship of the parent and child. . . .  That is, the parent remains entitled to visitation and responsible for child support; she [or he] also has the right to seek termination of the guardianship and a resumption of custody if at a later date she [or he] is able to provide a safe and secure home for the child."

---

[6] Effective July 2, 2021, N.J.S.A. 3B:12A-(6)(d)(3) was amended to eliminate the requirement that "adoption of the child is neither feasible nor likely."  L. 2021, c. 154 § 4.  We discern no reason to apply the amendment retroactively.  See James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (recognizing "[s]ettled rules of statutory construction favor prospective rather than retroactive application of new legislation").

[N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 509-10 (2004) (quoting N.J. Div. of Youth & Fam. Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003)).]

Where the court finds a parent's ability to care for a child will not improve in the future, permanency must not be delayed because "keeping the child in limbo, hoping for some long-term reunification plan" does not comport with New Jersey's law. N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) (citing In re P.S., 315 N.J. Super. 91, 121 (App. Div. 1998)).

Guided by these principles, we are persuaded the judge correctly found the four prongs of N.J.S.A. 3B:12A-6(d) were established by clear and convincing evidence. As to prong one, the judge relied on Dr. Kanen's credible testimony to find Layla was prone to "very poor judgment . . . [and] poor decision-making." Further, the judge accepted Dr. Kanen's opinion that Layla's limitations could "result in [Layla] being unreliable, undependable, struggling through functioning daily" and she would "have difficulty providing [Rory] with a permanent safe and secure home independently." Similarly, the judge credited Dr. Swanson's testimony that Layla was not ready for reunification with Rory because Layla was not viewed as Rory's psychological parent. He also found

27

Dr. Swanson's opinion that Layla could become Rory's psychological parent within a year "speculative."

"A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) (citing Carey v. Lovett, 132 N.J. 44, 64 (1993)). "[T]he weight to be given to expert evidence is within the competence of the factfinder." N.J. Div. of Youth & Fam. Servs. v. D.M., 414 N.J. Super. 56, 74 (App. Div. 2010) (quoting LaBracio Fam. P'ship. v. 1239 Roosevelt Ave., Inc., 340 N.J. Super. 155, 165 (App. Div. 2001)). Accordingly, the judge's determination to more heavily rely on Dr. Kanen's opinion over that of Dr. Swanson is entitled to our deference, as are the judge's findings on prongs one and two.

Turning to the third prong, N.J.S.A. 3B:12A-6(d)(3), we reiterate for reasons already mentioned that we do not consider the amended version of the statute. Also, because the judge: was mindful of Rory's need for permanency; credited the adoption worker's testimony that the resource parents "consent to [KLG]"; and accepted Marco's testimony that KLG was preferable to adoption, we decline to disturb the judge's finding that Rory's adoption was neither feasible nor likely.

N.J.S.A. 3B:12A-6(d)(3) also requires the Division to prove "it made reasonable efforts to provide services to help the parent correct the circumstances that initially led to the removal of the child[]." S.F., 392 N.J. Super. at 212. Those efforts "must . . . take into consideration the abilities and mental conditions of the parents." A.G., 344 N.J. Super. at 442. Nonetheless, the Division does not have to attempt more than "reasonable efforts under the circumstances to accommodate [a parent]'s disabilities," and a court may not find the efforts unreasonable simply because they "did not bear fruit." Ibid.

Here, Layla contends she "made reasonable efforts to reunify" with Rory, "with little to no assistance from" the Division, and that "[i]nstead of assisting [her] with its chief concerns, [the Division] did nothing." Such contentions are completely lacking in merit and warrant no further comment. R. 2:11-3(e)(1)(E).

Layla also argues it was error for the judge to find the third prong was established in that he failed to "arrive at any particularized findings or conclusions of law as to what efforts [the Division] made, reasonable or otherwise," for reunification. We disagree.

Here, the record demonstrates the judge referenced various services offered by the Division before finding the third statutory prong was satisfied.

For example, he found the Division "offer[ed] services incident to [Layla's] arrest" in November 2017, and although she "had a substance abuse evaluation and was recommended [for] level one treatment," Layla "did not comply with that request for level one treatment." Also, the judge concluded that following a psychological evaluation arranged by the Division, Layla was recommended for "substance abuse treatment, individual therapy and parenting skills training," but she was "inconsistent in following up [on] her individual therapy." Additionally, with respect to visits arranged by the Division, the judge stated, "Ms. Stanley credibly indicated that [Layla] had been inconsistent with her visitation in the year 2021."

It also is unrefuted the Division specifically requested Layla undergo drug screening in December 2020 and that the judge entered an order that month, and again in January and February 2021, directing Layla to submit to the screening. As we have mentioned, the judge found Layla did not abide by those orders.

We also do not ignore the judge referred to the bonding evaluations arranged by the Division. For example, he noted Dr. Kanen, the Division's expert, "did a bonding evaluation with both [biological] parents [and] with [Rory]." He also cited to "Dr. Kanen's evaluation of the bond that [Marco and Diane] had" with Rory. Thus, it is evident the judge implicitly found the

30 <span>A-2614-20</span>

Division offered a myriad of services to Layla to assist in her overcoming the obstacles that triggered Rory's placement.

The fourth statutory prong requires the court to determine whether "awarding [KLG] is in the child's best interests." N.J.S.A. 3B:12A-6(d)(4). A judge must consider the "paramount need" a child has "for permanent and defined parent-child relationships" when making a best-interest evaluation. In re Guardianship of J.C., 129 N.J. 1, 26 (1992). Although Layla argues the judge "gave undue preference to [Marco and Diane] and prioritized their wants over [her] rights," again, her contention is belied by the record.

Here, the judge credited not just the assessment of the Division's expert but also that of Layla's expert when concluding Layla was not ready to be reunified with Rory, and finding the child viewed Marco and Diane as her psychological parents. To the extent the judge stated Rory was living with "the only psychological parents . . . she has ever known," and this fact "loom[ed] over all other considerations," we are satisfied this remark does not detract from the judge's thoughtful analysis of various factors, including the testimony of experts who opined reunification was not a viable option. Thus, we discern no reason to disturb the judge's finding on the fourth prong.

A-2614-20

Finally, we need not extensively address Layla's due process arguments under Point II. "In general terms, '[d]ue process requires adequate notice and a fair opportunity to be heard.'" N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 390 (App. Div. 2016) (quoting N.J. Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464 (App. Div. 2003)). Due process "is a flexible concept and calls for such procedural protections as the particular situation demands." M.Y.J.P., 360 N.J. Super. at 464, 467.

Here, Layla argues she was deprived of due process because the judge improperly shifted the burden of proof to her and required her to demonstrate she was capable of parenting. She also contends the judge compelled her to prove the Division failed to "make reasonable efforts to reunify her" and KLG was not in Rory's best interests. Further, she argues the judge "grossly interfered" with the trial proceedings, including her case presentation. Again, we disagree.

As the Division makes clear, the Deputy Attorney General and Layla's attorney confirmed during summations it was the Division's burden to establish KLG was warranted. Our review of the record persuades us the judge fully understood this burden and did not shift it to Layla.

While rendering his opinion, the judge first found "by clear and convincing evidence that [KLG] is fully supported by the evidence." He then recounted the testimony of the witnesses, relying heavily on, and crediting the testimony of the Division's witnesses. As discussed, he accepted Dr. Kanen's finding that KLG, rather than reunification, was appropriate because Layla's inability to parent was unlikely to change and the child needed permanency. The judge also determined Layla's "lack of judgment" in not undertaking the drug tests ordered, not consistently visiting, and "testifying the way she did . . . satisfies . . . by clear and convincing evidence that <u>prong two is met by the Division's proof</u>." (Emphasis added).

Further, the judge accepted the testimonial evidence from Division witnesses about the variety of services Layla received. Under the circumstances, we are convinced the judge fully comprehended the Division bore the burden to establish by clear and convincing evidence that KLG should be awarded to Marco and Diane. And we are persuaded the judge's findings on the four statutory prongs are overwhelmingly supported by competent, credible evidence in the record.

Lastly, we decline to conclude the judge "grossly interfered" with Layla's presentation of her case. While we acknowledge the judge actively participated

in the trial by intermittently asking questions of witnesses and sua sponte excluding evidence, and he also declined to adjourn the KLG trial to permit Layla to produce her then-unavailable brother, Cary, to verify she worked for him,[7] the judge was entitled to take these measures. See N.J.R.E. 611 (providing in part, "[t]he court shall exercise reasonable control over the mode . . . of interrogating witnesses and presenting evidence to (1) make the [interrogation and presentation] effective for [the ascertainment of] the truth, [and] (2) avoid wasting time"); see also Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 611 (2022) (confirming "[a] trial judge's decision not to hold open the record or adjourn a trial to permit an unavailable witness to testify will not be disturbed on appeal absent an abuse of discretion"); and N.J.R.E. 614 (permitting a judge to "examine a witness regardless of who calls the witness").

Here, the judge was even-handed in his control of the proceeding. For example, when the Law Guardian asked about how Layla's one brother supervised her visits after she was released from Eva's Village, the judge referred to earlier testimony about Layla's brother being "in the other room"

---

[7] In denying the adjournment request, the judge told Layla's counsel that Cary "was available this morning. You could have subpoenaed him. . . . This is the trial. We're trying to get a decision made in this case."

during visits. He added, "that's considered supervision. Let's go somewhere else." Additionally, when the Law Guardian asked Marco whether Layla visited his home the day after Christmas in 2020, the judge remarked he was not "listening to this." In curtailing counsel's questioning, the judge explained the area of inquiry was "too far afield for anything" and focused on "such a tangential issue" which was "just not relevant."

Further, when the Deputy Attorney General pressed Layla on cross-examination about "not visiting with" Rory even though visits were offered by Marco and Diane, and counsel stated, "[t]his is [the] daughter that you're seeking to reunify," the judge immediately interjected, "she's answered the question. It's argumentative." And while Layla argues the judge "thwarted [her] counsel's efforts" by not affording counsel more time to produce Layla's brother to testify about the nature of her employment, we note the judge specifically "accepted [Layla's] position about work." Under these circumstances, we are not persuaded Layla was deprived of due process.

In sum, we perceive no basis to disturb the April 29 judgment awarding KLG to Rory's resource parents. To the extent we have not specifically addressed Layla's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2614-20