# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4139-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANACY,

     Plaintiff-Respondent,

v.

S.O.,

     Defendant,

and

A.C.,

     Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.C.,
a minor.

_____

     Submitted April 1, 2025 – Decided June 26, 2025

     Before Judges Susswein and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FG-08-0017-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer Sellitti, Public Defender, Law Guardian, attorney for minor A.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Peter Alvino, Designated Counsel, on the brief).

PER CURIAM

Defendant A.C. (Alex)[1] appeals the August 12, 2024 Family Part order terminating his parental rights to his daughter, Alicia. After reviewing the record in light of the parties' arguments and the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record. The Division of Child Protection and Permanency (DCPP) became

---

[1] We use pseudonyms to protect the parties' confidentiality. Defendant S.O. (Sally), Alicia's mother, does not appeal the termination of her parental rights.

A-4139-23

involved with Alicia's care when Cooper University Hospital reported that she tested positive for cocaine and methadone at birth.[2] Alicia was diagnosed with neonatal abstinence syndrome. She was admitted to the hospital's intensive care unit where she experienced symptoms of withdrawal and received morphine.

A DCPP caseworker responded to the hospital. Sally admitted to using fentanyl intravenously while pregnant. She also reported one incident of domestic violence between her and Alex.

Alex reported that he was unaware of Sally's illicit drug use during the pregnancy and he denied using any illicit drugs. Alex stated that he takes prescribed methadone due to a train accident but stopped taking opiates ten years ago. The DCPP caseworker noted that Alex "appeared to be nodding out" and "[h]e was not able to speak clearly or coherently." When asked about domestic violence, Alex stated that he had a court date scheduled but refused to discuss it further. Alex also reported that he was not currently working and stayed at his grandmother's home.

When asked, Alex offered his grandmother, Cora, as a placement option for Alicia. Sally did not provide any potential placement options, indicating that her mother had passed and she had no other family.

---

[2] Alicia was born in April 2024.

A-4139-23

On April 4, 2022, the DCPP caseworker visited Cora. Alex had not informed Cora that she was a proposed placement option for Alicia. Cora explained that Alex had been living with her for the last four years. Cora was concerned about Alex and Sally's drug use and domestic violence but agreed to consider caring for Alicia. However, on April 20, Cora changed her mind because she had "kicked [Alex and Sally] out" for stealing a "substantial" amount of money from her, and she was already the primary caregiver for her own daughter, Alex's mother, who was undergoing chemotherapy. When asked if she knew any other family members that may be willing to take in Alicia, Cora indicated that she could not think of anyone.

Over the next several days, the caseworker contacted Alex and Sally to find other placement options. Alex did not respond. Sally again indicated that she did not have any family. The caseworker reached out to the adoptive parents of Alicia's biological sister, but they were not interested in placement for Alicia. For the rest of April, Alex did not respond to the DCPP caseworker's attempts to contact him.

On May 3, the caseworker learned from Sally that she was headed to a substance use treatment facility in Atlantic City and Alex had started in-patient

substance use treatment on May 2. DCPP could not confirm Alex's treatment because he did not sign the release.

On May 5, pursuant to DCPP's order to show cause and complaint for custody, the court granted custody of Alicia to DCPP and ordered Alex and Sally to comply with all recommended substance abuse treatment, as well as submit to random urine drug screens. That same day, Alicia was released from the hospital and placed with a non-relative resource parent, Claire. The court also ordered that Alex and Sally could have weekly supervised visits with Alicia. Claire immediately contacted Cora to visit Alicia.

On May 19, DCPP learned that Alex was at Cora's home "on a pass" from the treatment facility to visit his mother, who was dying. On June 1, DCPP spoke to Alex, who indicated that he planned to return to the treatment facility. He stated that he had not used illicit substances in one month and "does not feel as though he needs to participate in inpatient" treatment. When informed of his court-ordered visitation with Alicia, he stated that he did not want to see Alicia without Sally. On June 7, Alex explained that he decided to forgo further impatient treatment because it was not court-ordered and he had resumed methadone maintenance.

A-4139-23

From May to early August, DCPP documented that Alex did not respond or show for nine court-ordered weekly visits with Alicia. During June and July, Alex did not show for four court-ordered random urine drug screens. He also missed several substance use and psychological evaluations, despite meetings, reminders, and transportation assistance.

In late July, DCPP learned that Alex had been arrested on an outstanding warrant for an aggravated assault with a deadly weapon charge. He was released within one week.

On August 4, DCPP again asked Cora to be a relative placement for Alicia, but she declined. DCPP asked Alex and Sally for placement options, but they did not have anyone to provide.

In early October, DCPP learned that Alex and Sally were arrested for shoplifting, missing a visit with Alicia. Later that month, Claire reported Alex "acting strange" and appearing "under the influence" during a visit. On October 21, DCPP learned that Alex had been arrested for a trespassing charge. In October, Alex tested positive three times for cocaine, fentanyl and once for benzodiazepine and opiates. From August to November, Alex attended nine court-ordered weekly visits with Alicia.

A-4139-23

On November 2, the court ordered that visitation could be expanded and reunification could be considered with "24/7 supervision" as Alex and Sally were living with Cora again. However, on December 2, DCPP learned that Alex and Sally were arrested for violating restraining orders, and Cora also informed DCPP that Alex and Sally could no longer stay with her.

DCPP met with Alex at the county jail several times  Alex declined visitation with Alicia because he did not want her in a "jail environment." Alex agreed to complete a psychological and parenting capacity evaluation.

Dr. Nicole Paolillo, Psy.D. interviewed Alex on March 7, 2023. During the evaluation, Alex denied having "any current health problems" and "affirmed having abused opiates for which he attended a methadone program in the community along with intensive outpatient." He "reported no experimentation or use of heroin or cocaine." Paolillo determined that Alex "did not articulate insight into his cycle of using substances but seemed to externalize that focus and place the responsibility on . . . his physical ailment" and "presented with limited judgment, you know, poor insight into his difficulties and how he can make better decisions."

A-4139-23

In early May, Alex was released from jail after pleading guilty to aggravated assault. He was sentenced to a six-month term of imprisonment, which was already served, and three years of probation.

On June 3, Alex suffered an overdose. Thereafter, Alex did not contact DCPP or respond to their several attempts to contact him.

On July 18, Alex and Sally failed to appear at a hearing concerning Alicia's permanency. The court entered an order including visitation and services as well as approval for a permanency plan of termination of Alex and Sally's parental rights. The court noted that "[b]oth parents have failed to complete substance abuse treatment and have continued to test positive for unprescribed substances. [Alex] overdosed in June 2023 and both parents lack housing suitable for reunification."

On August 21, Alex again failed to appear at a hearing concerning Alicia's permanency. The court entered an order terminating litigation because a complaint for termination of Alex and Sally's parental rights had been filed.

On August 31, Alex was arrested for shoplifting and charged with a probation violation. He reported he had returned the items he shoplifted, that he was homeless, and that his substance abuse was ongoing.

8

Paolillo evaluated Alex again on November 7 while he was in jail. He was awaiting sentencing, and did not yet have a plan for housing, income, daycare or medical providers for Alicia. He refused to answer questions relating to his knowledge of parenting, reporting that he felt "overwhelmed with the task of having to re-explain his thoughts about parenting." He "denied needing any treatment or services at this time."

On December 1, Alex pled guilty to the shoplifting charge and was released on probation.

On December 18, the caseworker was able to reach Alex by phone. Alex agreed to meet on December 20 but stated that he would call back later to arrange a location for the meeting. The caseworker called him eight times between December 20 and 29 but was unable to reach him to schedule a location to meet.

On January 11, 2024, Alex was arrested and later pled guilty to violation of probation Alex declined visits in jail with Alicia. He was sentenced to probation, and required to complete the New Jersey Recovery Court program and long-term inpatient treatment. If Alex failed to comply with those conditions, his alternate sentence was five years in New Jersey State Prison.

In early March, Alex was released to the Maryville in-patient treatment facility. During this time, Alex and Sally had four virtual visits with Alicia but

Claire terminated the visits because they "seemed to just be wanting to engage with each other as opposed to with [Alicia]." In early June, Alex was released to Real House, a sober residence facility with an intensive outpatient program. While at Real House, Alex had one visit with Alicia but missed or cancelled four visits.

On July 22, the guardianship trial was held. DCPP presented testimony from Paolillo, DCPP caseworker Ben Fiore, resource parent Claire, and Alicia's paternal great-grandmother Cora.

Paolillo testified about Alex's March 3 and November 17, 2023 evaluations. She testified that Alex is not in a position to provide the "minimum level of safe parenting" for Alicia. She noted that his inability to maintain visits once he was responsible for getting there on his own was indicative of poor planning and a lack of resourcefulness. She stated that "[Alex] presents with ongoing characterological and maladaptive traits that compromise his judgment, insight, [and] decision making . . . ." Further, Paolillo opined that Alex needs support to meet his own needs so supporting Alicia "exceeds his potential."

Fiore testified about DCPP's involvement with Alex and Sally. Fiore stated that Alex has completed two psychological evaluations through DCPP but has not completed any substance abuse evaluations through DCPP. He also

10

explained that Alex has attended several treatment facilities. He asserted that Alex was in jail five times during Alicia's life, "in July of 2022 for about a week. Then it was October [20]22 for about a week, November [20]22 to May [20]23[,] and it was October [20]23 to December [20]23[,] and then January [20]24 to March [20]24." He also stated that, since Alex has been residing in Real House, he has had one visit with Alicia. Fiore testified, at that time, Alex "ha[d] [not] reported a plan" for housing and that he was not aware of any plan for income or employment.

Fiore also testified about Alicia's resource parents. He stated that "[Alicia] is very interactive with her resource parents" and appears "comfortable [and] happy." He also explained that the resource parents are not interested in kinship legal guardianship (KLG) but are interested in adoption. Fiore noted that the resource family is "willing to continue contact with the biological [family] if they were to adopt."

Claire testified about her family's relationship with Alicia and her birth family. She stated that Alicia sees Cora "at least four to five times [per] week" and that Cora and other relatives have visited her home for holidays. Claire testified that Alicia also maintains contact with Alicia's half-sister. Claire stated that she would allow Alex and Sally to have contact with Alicia after adoption.

11

Claire also testified that the resource parents do not want KLG, but instead wanted to adopt. She explained that their decision to favor adoption over KLG stemmed from several considerations, including an interest in making plans for Alicia if something happened to them, an interest in avoiding future litigation about Alicia, an interest in protecting Alicia from Alex and Sally's inconsistency, and the ability to form "a lifelong bond with [Alicia]" without wondering "how long it's going to be."

Cora testified that she has taken care of Alex for "a lot of years" and had given him money, transportation, and supervision during visitation with Alicia at her home. Cora also discussed the last time she saw Alex and Sally together in December 2023. She had picked Alex up from the hospital and he made her drive to Camden to look for Sally by grabbing the steering wheel and scaring her. When they found Sally, Alex "beat her up." Alex then fell asleep in Cora's car and left the next morning.

Cora further testified that she saw Alicia's resource family three to four times per week for a few hours at a time. She stated that she would like to see the resource family adopt Alicia and for Alex to get to visit. She testified that she did not think Alex could parent Alicia on his own.

A-4139-23

On August 12, 2024, the trial court determined that DCPP established all four prongs of the best interests test set forth in N.J.S.A. 30:4C-15.1  This appeal follows.  Defendant raises the following contentions for our consideration:

POINT I

The Trial Court's Repeated Negative Inferences Regarding Alex's Decision to not Testify Shifted the Burden of Proof to Him.

POINT II

The [Trial] Court's Legal Conclusion DCPP Proved by Clear and Convincing Evidence that (1) Alicia's Health and Development Will Be Endangered by Her Relationship with Her Father and (2) Alex Was Unable or Unwilling to Eliminate any Alleged Harm or Provide a Safe and Stable Home, Is Incongruent with both the State's Evidence and Addiction Medicine.

    A. Prong One

    B. Prong Two

POINT III

The [Trial] Court's Prong Three Alternatives to Termination of Parental Rights Determination Was in Error; Concom[]itantly, because Parental Rights Must be Preserved Whenever Possible and Kinship Care Is Always in a Child's Best Interests, the Court's Legal Conclusion the State Clearly and Convincingly Proved Termination of Parental Rights Will Not Cause Alicia More Harm than Good Was in Error.

13

A. KLG is Permanency and the Resource Parent Had No Authority to Determine the Outcome in this Matter.

B. The Right to Relational Permanency.

C. The Trial Court's Prong Four Determination Was Based Upon a Flawed Understanding of Permanency.

## II.

We begin our analysis by acknowledging the governing legal principles. An appellate court's review of a Family Part judge's factual findings in a guardianship trial is limited. In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Those findings are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). The court may reverse a factual finding only if there is "'a denial of justice' because the family court's 'conclusions are [ ] "clearly mistaken" or "wide of the mark."'" Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)); see also Cesare, 154 N.J. at 412 (holding that an appellate court should not disturb the trial court's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence

14

as to offend the interests of justice") (quoting Rova Farms Resort, Inc., 65 N.J. at 484).

"[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006). However, the "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "Whether the facts found by the trial court are sufficient to satisfy the applicable legal standard is a question of law subject to plenary review on appeal." State v. Cleveland, 371 N.J. Super. 286, 295 (App. Div. 2004); see also N.J. Div. of Child Prot. & Perm. v. A.B., 231 N.J. 354, 369 (2017) ("[W]e review the judge's legal conclusions de novo."). In addition, no appellate deference is owed to a trial court's interpretation of a statute. Maeker v. Ross, 219 N.J. 565, 574 (2014) (citing Aronberg v. Tolbert, 207 N.J. 587, 597 (2011)); see also N.J. Div. of Child Prot. & Perm. v. Y.N., 220 N.J. 165, 177 (2014) ("[W]e need not defer to the Appellate Division's or trial court's interpretive conclusions.").

Turning to substantive legal principles, the Legislature created a multi-part test to determine when it is in the child's best interest to terminate parental

rights. Specifically, N.J.S.A. 30:4C-15.1(a) requires DCPP to prove four prongs by clear and convincing evidence. They are:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) [DCPP] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

## III.

We first address defendant's contention the trial court erroneously found that DCPP established prong one and two because the court failed to consider his recent progress. He also argues that the court "wrongly speculated out of whole cloth that Alex's achievements were solely due to the consequences of noncompliance with the [New Jersey Recovery Court] program[,]" instead of his interest in parenting Alicia. He asserts that addiction is not the "harm or

16

endangerment of which prongs one and two speak [to][,]" so the trial court should have been given him more time for reunification efforts.

We are unpersuaded.  To satisfy the first prong, there must be evidence that the parent caused the child harm.  In re Guardianship of K.H.O., 161 N.J. 337, 348-49 (1999).  While one single harm may be sufficient, "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." Id. at 348.  Prong two requires there be parental unfitness, which can "be demonstrated that the parent is 'unwilling or unable to eliminate the harm' that has endangered the child's health and development" or "if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." Id. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)).  While prongs one and two are separate inquiries, they are related and "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

We fully accept that "[d]rug rehabilitation does not generally progress without incident[,]" N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 330 (App. Div. 2011).  But that does not change the fact that "[a] parent's withdrawal of [their] solicitude, nurture, and care for an extended period of time

17

is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. In deciding whether a parent can continue the parental relationship without recurrent harm to the child, the court can consider past behaviors. J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978).

Further, permanency is favored over extended reunification efforts, as "[t]he trend over the last thirty years has been toward foster care reforms that place limits on the amount of time a parent may have to correct conditions at home in anticipation of reunification." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 116 (App. Div. 2004) (quoting K.H.O., 161 N.J. at 357-58). "[P]lacement plans must not lose sight of time from the perspective of the child's needs." K.H.O., 161 N.J. at 357.

In this case, the trial court determined that prongs one and two were met. Addressing prong one, the court acknowledged that Alex had "made strides" but concluded that they were not enough, stating:

> [I]t is true that when [Alex] . . . was released last on a guilty plea to multiple charges, that he was discharged to Maryville. There was every indication he successfully completed [the program]. . . . He was discharged to a sober living environment. So, . . . he has made strides.
>
> . . . . [But,] they're not enough. He does not have the structure. He doesn't have the self-insight in order to put himself in a position in the future to reunite with

18

his daughter. Certainly, he can't do so now in a sober living facility, with no job, no prospect of any housing, that I'm aware of. He declined to testify, so if he had any plan, I didn't get to hear about it.

So, I [find] . . . [Alicia]'s safety, health, and development would continue to be endangered by a continuing relationship with her father. He has denied his active substance abuse now for years, while he continued to use, not just the pain medication that he, initially, got addicted to, but has grown and mushroomed into now fentanyl, cocaine, and benzodiazepines. So, [p]rong [one] is satisfied.

The court continued its analysis with respect to prong two, finding that Alex "still has many hurdles left in front of him" including finishing the New Jersey Recovery Court program and making plans for housing and employment. The court stated:

[H]e has addressed certain of the harms. . . . [S]ince he went to Maryville, there has not been a single positive drug screen. I take that fact with a large grain of salt. Because, why is he doing that? Does he have the motivation and wherewithal to continue on that path throughout the drug recovery program to escape state prison time? I have a substantial and . . . objective concern that he's going to[,] for the umpteenth time[,] violate probation, at which point will serve the remainder of his five years flat in state prison.

If he manages to get through the [New Jersey Recovery] [C]ourt program, he still has many hurdles left in front of him, as described by Dr. Paolillo. He has formed no even conceptual plan for employment, housing, or the continued services, which he simply

19

thinks he doesn't need, to put himself in a better position to reunite with his daughter. The best that can be said about [Alex] right now is he hasn't taken drugs . . . since June of 2024.

. . . .

So, I find that [Alex's], the reason for his negative drug screens is, he's facing real state prison time. . . . Throughout all the testimony, he was emotionless, staring off into space. He never fell asleep that I could see, but he never . . . seemed engaged. . . .

. . . . He decided that it was not in his best interest to testify. I don't believe at this stage that he has demonstrated a willingness or an ability to do what is necessary. . . .

Delaying placement will not benefit the child. Dr. Paolillo was very clear in that the time it would be necessary if we were to start at the moment he went to Maryville is simply too long and the likelihood of success is too low to make that gamble worthwhile, because it's a delay in permanency to [Alicia] that's on the line.

We are satisfied that during Alicia's life, Alex has endangered her and that while he appears to be on a path to recovery, there is no indication that he will be able to care for Alicia in the near future. Alicia has been in the care of the State and the foster care system since birth, as Alex failed to plan for her arrival by securing stable housing or employment. Further, the record shows that Alex has consistently failed to be a part of Alicia's life. While the root of Alex's

20

unreliability may be his substance use disorder, as we have noted, permanency is favored over extended reunification efforts. See C.S., 367 N.J. Super. at 116. We are thus unpersuaded by Alex's contention that the trial court should have given him more time. We note the trial court had already extended the timeline. Under the statutory framework, DCPP must file a petition to terminate parental rights:

> [Whenever] . . . it appears that a parent . . . has failed for a period of one year to remove the circumstances or conditions that led to the removal or placement of the child, although physically and financially able to do so, notwithstanding the division's reasonable efforts to assist the parent or guardian in remedying the conditions[.]
>
> [N.J.S.A. 30:4C-15(d).]

Further, "[a] petition shall be filed . . . no later than when the child has been in placement for [fifteen] of the most recent [twenty-two] months, unless the division establishes an exception . . . ." N.J.S.A. 30:4C-15(f).

Here, Alicia was released from Cooper University Hospital into DCPP's care on May 5, 2022. Fifteen months later on August 21, 2023, DCPP filed the petition seeking termination of Alex's parental rights. DCPP waited as long as it could before filing the petition. The trial court then waited one year before ruling on the petition, convening the trial on July 22, 2024 and rendering its

21

decision on August 12, 2024.  Continuing to wait for Alex to provide a safe home for Alicia would effectively put Alex's interests before Alicia's, contrary to the fundament of the best-interests-of-the-child standard that governs these proceedings.

Ultimately, Alex has not explained—and fails to argue—that he can eliminate the harm facing Alicia.  It is clear from the record that Alicia's safety, health, and development have been endangered by Alex.  We thus conclude the trial court did not err in holding that DCPP proved prongs one and two.

IV.

We next address Alex's contention the trial court erroneously allowed Claire to subvert its authority in determining whether to terminate his parental rights.  He contends that the court wrongly rejected KLG as an option because Claire was only interested in adoption.  Alex also contends that July 2021 legislation "reflects an enhanced protection of parental rights via support of KLG as a permanency plan to maintain relational permanency, especially with the birth family."

We are unpersuaded by these arguments. When DCPP considers KLG, "[it] is seeking to add another alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for

A-4139-23

caregivers in relationships where adoption is neither feasible nor likely . . . ."[3] N.J.S.A. 3B:12A-1(c). The purpose of KLG is "to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them . . . ." N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 259-60 (App. Div. 2019) (quoting N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (2007)). N.J.S.A. 3B:12A-5(a) explains that the court may appoint a KLG "[u]pon petition of a caregiver" and details what the petition and assessment must include.

When considering alternative permanency options, a resource parent is not given "greater rights than those contemplated by the legislative system" as

> such indulgence toward [resource] parents would tend to destroy the entire system of foster care by creating an impediment to the voluntary consent of an unfortunate parent who cannot care for the children because of health, economic reasons or other infirmities, but who nevertheless has a sincere interest in the welfare of [their] children and their ultimate return to the family fold.
>
> [W.C. v. P.M., 155 N.J. Super. 555, 565-66 (App. Div. 1978).]

---

[3] Under N.J.S.A. 3B:12A-(6)(d), courts are no longer required to find that adoption is "neither feasible nor likely" before granting KLG. L. 2021, c. 154., §6(d)(3).

A-4139-23

However, a resource parent's preference regarding KLG or adoption is a relevant consideration under prong three. M.M., 459 N.J. Super. at 262-63 ("[T]he caregiver must be fully informed of the potential benefits and burdens of KLG before deciding whether [they] wish[] to adopt. Once [they are] provided with that comparative information, the caretaker's preference between the two alternatives should matter.").

Here, the trial court determined with respect to prong three that Alicia's best option was for Claire to adopt her. In reaching this conclusion, the court first concluded that DCPP had engaged in reasonable efforts to help Alex correct the circumstances leading to Alicia's displacement, including offering "substance abuse services, domestic violence treatment, parenting skills courses" as well as "mak[ing] even effort to provide visitation for both parents" while Alex was in jail and out of jail.

The court next addressed alternatives to terminating parental rights, stating:

> [C]ertainly [DCPP] has, . . . and has documented, its efforts to give meaningful choice on what form permanency would take in this situation. It had substantive discussions with respect to [KLG], which this [c]ourt understands has been found to be as a matter of public policy to be an equivalent form of permanency to adoption.

24

This particular resource parent demonstrated to the [c]ourt in her testimony that she understood the difference. And for very substantive reasons and objectively reasonable bases did not want to pursue [KLG], and she felt that the form of permanency offered by ultimate adoption was far superior given the circumstances she had experienced with [Sally] and [Alex]. So, I have considered alternatives, and under these circumstances[,] termination of parental rights is the only viable alternative.

The record shows Claire was unwilling to accept KLG and never filed a KLG petition. When asked whether she would consider KLG instead of adoption, Claire stated:

[Alicia] deserves the opportunity to be legally adopted into our family. With adoption, it provides legal rights and permanency that KLG does not offer. You know, the right that if something would happen to [my partner] and I that, without a will, that she wouldn't . . . have an inheritance through us . . . we wouldn't be able to decide which family member would be able to take care of her . . . . We also . . . really don't want to return back to court and, with [KLG], . . . there's something always overhead and we can always go back to court and the parents could essentially get reunified.

I think that adoption . . . offers more stability and consistency for [Alicia]. We also don't want court ordered visitations because, as you may know . . . sometimes [Sally and Alex] go off the grid . . . and then if I'm responsible for the visitations, I have to worry . . . .

. . . . I also don't want the subject . . . [Alicia], as she gets older, [to] the disruptions and uncertainty of if

she's going to have a visit. . . . I also want to protect her from any, like, negative interactions with the parents. I have had a couple of conversations where I was getting yelled at or spoken to with disrespect and I just felt like I had to take it because, in the end, . . . this is the agreement we have and, with KLG, that would still be an agreement between us . . . .

. . . . I want to have her in my family for lifelong. I don't want that lingering over her head, you know, how long it's going to be.

While Claire's preference was taken into consideration, she was not given greater authority than permitted. She did not, as Alex contends, usurp the court's authority. Nor are we persuaded by his interpretation of the July 2024 amendment's impact.

V.

We turn next to defendant's contention the trial court erred in finding that DCCP proved prong four of the best interests test. The fourth prong requires an assessment of whether the termination of parental rights will do more harm to the child than good. N.J.S.A. 30:4C-15.1(a)(4). This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. "If a child can be returned to the parental home without endangering [their] health and safety, the parent's right to reunification takes precedence over the permanency plan." N.J. Div. of Youth & Family

Servs. v. L.J.D., 428 N.J. Super. 451, 491-92 (App. Div. 2012) (citing N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607-09 (1986)). "On the other hand, 'termination of parental rights likely will not do more harm than good' where the child has bonded with the resource parents in a nurturing and safe home." Id. at 492 (quoting E.P., 196 N.J. at 108).

Here, the court made adequate, indeed ample, findings to support its conclusion with respect to prong four. The court first acknowledged Alex's relationship with Alicia:

> For [Alex], his case is more of a judgment call, and it is more where judicial discretion comes in. . . . Alex has never demonstrated the qualities to show the [c]ourt that within any perceivable period of time he could be in a position to reunite with [Alicia].
>
> . . . . [T]he only time [Alex] was around [Alicia] in the beginning was . . . immediately after [Sally] gave birth and he was in the hospital nodding out and appeared to be high on some substance. . . . So, he's never really had a parental relationship with [Alicia]. . . .

The court then addressed Claire's role, stating "[p]ermanency, in this case, will be found with a resource parent who's been doing an outstanding job." The court concluded:

> [Alex], he's managing to stay out of jail. He's been in and out of jail several times. There was no testimony about recent charges. But, just from what he has pled guilty to, they are significant crimes of

27

violence, . . . one of which was a serious crime of domestic violence, that being strangulation. And he has not done anything to meaningfully address those problems and character flaws that led him to do those things.

Importantly, the court had the benefit of expert testimony. Paolillo testified that Alex "presents with characterological and maladaptive traits that compromise his judgment, insight and decision making . . . ." She opined that needed support simply to meet his own needs, and adding responsibility for Alicia's needs would exceed his potential. She concluded that Alex could not provide Alicia with a minimal level of safe parenting at the time of trial and that he would not be able to do so in the foreseeable future. The court was entitled to find this expert opinion credible.

We agree with the trial court that while terminating Alex's parental rights may harm Alicia given their potential bond, any such harm is greatly outweighed by the benefits of adoption, especially considering that Claire's home provides basic necessities that Alex cannot provide, even for himself.

VI.

We need only briefly address Alex's contention the trial court improperly made negative inferences against him based on his decision not to testify, thereby committing structural error by shifting the burden of proof onto him. It

28

is undisputed that a court may not make presumptions against parents in termination of parental rights cases; rather, all doubts that arise "must be resolved against termination of rights." K.H.O., 161 N.J. at 347.

During closing argument, the trial court asked defense counsel, "[i]f when I'm considering the evidence, I was inclined to take an adverse interference from the fact your client chose not to testify, why should the [c]ourt not do that?" However, before rendering its decision, the court stated unequivocally: "neither parent testified. I take no adverse inference from that fact." (Emphasis added).

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division